570 A.2d 796 (1990)
In re D.R.M.
Appeal of B.M.
No. 88-20.
District of Columbia Court of Appeals.
Argued December 12, 1989.
Decided February 28, 1990.
*797 Justine A. Dunlap, appointed by this court, for appellant.
Harvey Schweitzer, with whom James A. Shrybman, Silver Spring, Md., was on the brief, for appellee.
Frederick D. Cooke, Jr., Corp. Counsel at the time the statement was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., filed a statement in lieu of brief, for appellee the District of Columbia.
Before TERRY, SCHWELB and FARRELL, Associate Judges.
FARRELL, Associate Judge:
In this appeal from the grant of a petition for adoption, B.M., the natural mother, challenges the trial court's conclusion which had the effect of terminating her parental rightsthat her refusal to consent to the adoption was not in the best interest of her child, D.R.M. She asserts that the court erred in applying the statutory standards governing termination of the parent-child relationship set out in D.C. Code § 16-2353(b) (1989), and in failing to consider the criteria for determining whether an adoption petition should be granted set forth in D.C.Code § 16-309(b). She further contends that, by failing to accord adequate weight to her pattern of visits with the child beginning nineteen months after the child's birth, the court violated her constitutionally protected right to raise her offspring. Finally, she claims that the court placed too much emphasis on her failure to comply with a case plan developed by the Department of Human Services (DHS).
Because the record reveals that the judge carefully considered all relevant factors in the course of his inquiry, including those set out in § 16-309(b), we conclude that his use of standards relating to termination of parental rights as an analytical framework was not erroneous. We also find clear and convincing evidence in the record to support the judge's conclusion that the mother's belated pattern of visits with the child did not result in a relationship so strong as alone to warrant denial of the adoption petition, and accordingly we reject the constitutional claim. Finally, we find no error in the judge's consideration of B.M.'s performance under the case plan. Accordingly, we affirm.

*798 I.

A.
D.R.M. was born on October 5, 1985, at the Washington Hospital Center. Two days later, a hospital social worker notified the District of Columbia Department of Social Services after the mother, B.M., left the hospital without D.R.M. In a meeting with a social worker on October 15, 1985, B.M. indicated that she was experiencing emotional problems and uncertain whether she wanted to keep the baby. She voluntarily signed the child into the emergency care of DHS. On that day, D.R.M. was removed from the hospital and placed in a foster home, where she remained until the foster parent died on March 29, 1986, at which time she was placed in a second foster home.
In November 1985, Donna Dixon, a social worker in the Child and Family Services Division of DHS, began attempts to contact B.M. to explore the possibility of reuniting her with D.R.M. At the same time, she ascertained that neither of the men who could possibly be the father nor any member of B.M.'s family had any interest in caring for the child.[1] After months of unanswered telephone calls and letters, Ms. Dixon finally spoke with B.M. in April of 1986. B.M. expressed an interest in seeing D.R.M., and Ms. Dixon indicated her willingness to assist B.M. in working toward reunification, offering to set appointments to discuss formulation of a case plan and visitation arrangements. B.M. failed to attend the initial appointment, and subsequent attempts to reach her by mail and telephone proved fruitless.
On April 15, 1986, acting on a petition filed by Ms. Dixon and the Corporation Counsel, the Family Division of the Superior Court, Judge Graae, ordered the child placed in shelter care pending further action by the Family Division.[2] His order allowed B.M. supervised visitation rights arranged through the social worker.
In October 1986, approximately a year after the child's birth, Ms. Dixon referred D.R.M.'s case to the Adoption Unit of DHS recommending "permanency planning" meaning either adoption or long-term foster care. Ms. Dixon based her recommendation on B.M.'s continuing failure to work with DHS toward reunification with D.R.M., and the unwillingness of family members to care for the child. According to Ms. Dixon's testimony during the adoption hearing, although reunification was still a possibility, these circumstances necessitated long-term planning.
On October 17, 1986, the Family Division, Judge Huhn, adjudged D.R.M. neglected and ordered the child committed to the custody of DHS and placed in a suitable foster home.[3] B.M. did not contest this determination or disposition. She entered a stipulation admitting that she had not seen D.R.M. since her birth, was presently unable to provide a home or care for D.R.M., and did not expect to be able to assume parental responsibilities until she obtained a job, suitable housing, and day care, and achieved other stabilizing measures. The stipulation discussed the prospect of reunification, but provided that prior to reunification of the mother with D.R.M., the mother must: 1) fully cooperate with the assigned social worker, 2) maintain regular and frequent visitation with the child, and 3) follow through with all appropriate referrals, including submitting *799 to a psychiatric evaluation, participating in counseling, and attending parenting classes. The stipulation also provided that B.M. had visitation rights.
Following Ms. Dixon's referral, the DHS Adoption and Placement Resources Branch, in consultation with Ms. Dixon and others, identified petitioner in November 1986 as a likely adoptive parent for D.R.M. D.R.M. was placed in the petitioner's home on November 21, 1986, as an "at risk" adoptive placement.[4] Concerned over D.R.M.'s uncertain legal status owing to the continued existence of B.M.'s parental rights,[5] petitioner filed a petition for adoption the same day.
Following the placement, Ms. Dixon continued her attempts to have B.M. meet with her to develop a case plan identifying goals that would favor reunification if accomplished by B.M. Reports submitted by Ms. Dixon in status hearings on D.R.M.'s neglect commitment chronicle Dixon's lack of success, and B.M.'s continuing failure to abide by the terms of the stipulation requiring cooperation with the social worker.[6] Acknowledging that she had been contacted during this period, B.M. testified that she "was not interested in doing a case plan" but that she did want to see her child.
Finally, on April 27, 1987, B.M. met with Ms. Dixon to work on the case plan. The two discussed D.R.M.'s placement, the fact that it could result in adoption, and the need for serious effort on B.M.'s part to secure reunification. Like the stipulation, the plan required B.M. to obtain stable employment and housing, to allow home visits by representatives of the agency, to follow through on the social worker's referrals and recommendations for psychiatric evaluations and counseling and parenting classes, and to maintain frequent and regular visits with the child.
Regular visits were scheduled with D.R.M. commencing May 13, 1987, most of which B.M. attended. B.M. also attended psychiatric evaluations in May and August 1987, although her cooperation with the examining psychologist during the second session was poor. In the meantime, the Adoption Branch completed its post-placement evaluation of the petitioner.[7] On March 23, 1987, the Commissioner on Social Services approved a report recommending that the court grant an interlocutory decree of adoption which would become final after *800 six months.[8]
Because B.M. had not relinquished her parental rights and they had not been terminated by court order,[9] the court on June 22, 1987, entered an order requiring B.M. to show cause why the adoption petition should not be granted. On motion of counsel for B.M., the court on August 17, 1987, consolidated the ongoing neglect proceeding and the contested adoption proceeding. Following a four-day hearing in November 1987, the Family Division, Judge Mencher, granted the petition for adoption after concluding that the evidence clearly and convincingly established that B.M.'s consent to the adoption was being withheld contrary to the best interest of D.R.M.[10]

B.
The judge found that B.M. "chose to ignore" letters from Ms. Dixon in early 1986 asking her to contact the agency to begin planning for reunification. Based upon Ms. Dixon's testimony, he found that until April 1987, B.M. had refused to participate in development of a case plan that would eventually result in reunification of B.M. and D.R.M. He found that, although the objectives of the case plan to which B.M. ultimately agreed were realistic and obtainable, "even with the assistance of Ms. Dixon, [B.M.] was unable, or unwilling, to comply with the tasks set out in the case plan." To date B.M. had not achieved the stability in employment called for in the plan, and although she testified that she hoped to obtain an appointment with the police department[11] and was awaiting a license enabling her to take a security job with a drug store, there was no evidence confirming that these employment prospects were more than hopes or expectations. Similarly, the court noted that, although B.M. testified that she expected to obtain better housing, her testimony was also unsupported by any evidence concerning when this would occur, or identifying what steps she had taken toward this goal. Undisputed evidence showed that B.M. had moved at least four times since D.R.M.'s birth and was currently residing in her sister's two-bedroom apartment along with her fiancé, her sister, and her sister's son.
The judge concluded that B.M.'s testimony that she expected to attain these goals in the future could not substitute for compliance with case plan objectives. The judge also noted that B.M. had failed to attend counseling and parenting classes to which she had been referred,[12] that she had refused Ms. Dixon's request to inspect her home during the time she resided at a rooming house, and that she was uncooperative and had refused to participate in certain parts of a psychological evaluation ordered by the court to determine her competency to parent a child. Indeed, the court found that the only aspect of the plan with which B.M. attempted to comply was the requirement of regular and frequent visitation with D.R.M.
In this regard, the judge found that B.M. had visited D.R.M. thirteen or fourteen times since the child's birth. Unpersuaded by B.M.'s testimony that she was unaware initially of her right to visit the child, he found that B.M. had understood she was *801 allowed regular visitation at least since she signed the stipulation on October 17, 1986, and perhaps since Judge Graae's April 15, 1986 order placing D.R.M. in shelter care.[13] The judge found that "[n]otwithstanding the order of Judge Graae, the stipulation[,]... and the continued encouragement of DHS workers, the natural mother, who was represented by counsel, did not visit or attempt to develop a relationship with her child until May, 1987." B.M.'s visitation after May 1987 was "sporadic", although the visits "usually went very well." The judge did not explicitly assess the quality of the relationship between B.M. and D.R.M. that emerged from these visits, but concluded that "[t]he [child's] `relationship' with her natural mother did not begin to develop until May 1987."
The judge also made findings based upon the results of psychological evaluations ordered by the court to determine B.M.'s capacity to parent a child, as set out in reports submitted by DHS and the hearing testimony of Dr. Marilyn Meyers, the examining psychologist. Dr. Zelda Teplitz of the Bureau of Forensic Psychiatry conducted the initial interview, concluding in her report that B.M. "presented a superficially disarming impression of a woman with good intelligence in terms of comprehension and vocabulary," but that it was "possible that she was presenting herself in the most favorable light or that she is hypomanic, in her unrealistic work aspirations."[14] She recommended clinical diagnostic testing, "including the Rorschach projective test to determine ego distortion of reality," concluding that B.M.'s "ability to carry through her plans should be tested, because of past history."
Dr. Meyers conducted the clinical tests. Her report indicated that its assessment was based on an incomplete evaluation "due to the fact that [B.M.] was extremely guarded, defensive and hostile throughout." Dr. Meyers testified that B.M. was "not willing to cooperate with completing all of the tests that I was interested in administering," and that B.M. remarked that the tests were "foolish," that Meyers had wasted her time," and that she "could have stayed at home that day." Dr. Meyers testified that she had hoped to gain B.M.'s cooperation by explaining that the purpose of the tests was to assist her in regaining custody of her child, and encouraged her to continue, but that B.M.'s attitude remained "angry and defiant."
On the basis of the interview and tests that were completed, Dr. Meyers concluded that B.M. would have difficulty meeting the needs of the child because of her inability to regulate her impulses and to distinguish between her own needs and those of others, including her child. Dr. Meyers also concluded that B.M. suffered from a severe personality disturbance and low self-esteem, and that she "lack[ed] insight or judgment into her situation or life."[15] Relying on Dr. Meyers' testimony, the judge found as a fact orally that B.M. *802 would have difficulty meeting the needs of the child on a consistent and regular basis. In his written findings, the court reiterated that B.M. "suffers from mental health problems that prevent her from adequately caring for [D.R.M.]."
In summary, the court found that B.M. had failed to achieve the goals identified in the stipulation and case plan, and "has provided little or no evidence that she has the ability now, nor in the future, to care for a small child." Acknowledging B.M.'s visits with D.R.M., the court observed: "the only ... parental involvement is the visitations which I find started way too late to blockto in and of themselves be able to stop this adoption, which I find would be in the best interest of the child." The court explained that B.M.
wanted the child on her own terms, and it can't go that way when you're dealing with a little child like that.... Once a child comes in the neglect system, and somebody moves for adoption, it's not a matter of wanting the child on your own time. You've got to move. You've got to swiftly do something and it can't be mere expectations and high hopes for the future.... [U]nfortunately for reasons best known to the mother ... she was unable or unwilling to grab that very serious problem and get back into the child's life in a way that would have stopped the adoption from going forward.
The court found that the petitioner, a 38 year old female staff attorney with the United States Department of Education, would be a positive influence on D.R.M. Relying on the testimony of the petitioner, Ms. Lewis of the Adoption Branch, and Lastenia Brathwaite of the Intensive Services Branch, the court found that D.R.M. was well-integrated into a stable home provided by the petitioner, and had bonded well with and was loved by the petitioner and her extended family. The petitioner had passed a thorough background check and attended classes sponsored by DHS to prepare for adoption of a child, and had made arrangements for appropriate day care, education and medical treatment for D.R.M.[16] The court further found that the petitioner's home, a three-bedroom apartment in the District of Columbia approved by DHS, adequately met D.R.M.'s needs and that, although the petitioner was a single parent previously married on two occasions, the resources available to her enabled her to provide D.R.M. with a proper home and education.

C.
In determining whether B.M. was withholding her consent to the adoption contrary to the best interests of the child, the trial court found "relevant the four criteria utilized under D.C.Code § 16-2353(b) ... for termination of parental rights."[17] In its conclusions of law, the court concluded that D.R.M.'s need for continuity of care and caretakers and timely integration into a stable and permanent home would be met by remaining with the adoption petitioner. The judge noted that D.R.M. had never known her natural mother until May of 1987, and since then had only seen her thirteen or fourteen times. He concluded that the case therefore did not involve a "reunification" in the practical sense of the word. Moreover, the natural mother had *803 provided little or no evidence of a present or future ability to care for the child.
With regard to the physical and emotional health of all concerned, the court concluded that the petitioner was able to give D.R.M. a proper home, education, and treatment for her medical problems, whereas the natural mother suffered from psychological problems preventing her from adequately caring for the child. He found that D.R.M. had bonded well with the petitioner and concluded that any disruption would not be in the child's best interest.
Regarding the quality of interaction between D.R.M. and her parents, siblings, and caretakers, the court concluded that she had had no relationship with either her natural father or her half-sister and that any "relationship" with the natural mother had only begun to form in May 1987. In addition, the natural mother had failed to secure stable employment or proper housing and had spurned help in acquiring parenting skills. The adoption petitioner, on the other hand, had established a stable and warm relationship with D.R.M. and would provide a proper environment for the child's growth and maturation. Given the child's age, the court did not seek her opinion of her own best interests in the matter.

II.
B.M. contends that the judge abused his discretion in failing to apply the factors set out in D.C.Code § 16-309(b) governing when an adoption decree should be granted,[18] asserting that the judge's oral and written rulings are bare of any consideration of these criteria. We disagree. While it is true that the judge's analysis did not track, or even mention, § 16-309(b), we conclude that his inquiry adequately addressed the critical factors there identified, and that substantial record evidence supports his findings and conclusions on those matters.

A.
In his oral and written conclusions of law, the judge correctly framed the central issue as whether the petitioner had shown by clear and convincing evidence that B.M.'s consent to the adoption was being withheld contrary to the best interest of the child. Whether to grant an adoption petition over the objection of the natural parent is a matter committed by statute to the discretion of the court, D.C.Code § 16-304(e), provided it reaches the conclusion, after a hearing, that consent to the adoption is being withheld contrary to the best interest of the child. Id. As we have often recognized, this standard is flexible and not susceptible to ready definition; "it must of necessity contain certain imprecision and elasticity." In re J.S.R., 374 A.2d 860, 863 (D.C.1977), citing In re N.M.S., 347 A.2d 924 (D.C.1975); Johnson v. Lloyd, 211 A.2d 764 (D.C.1965); Coles v. Coles, 204 A.2d 330 (D.C.1964). See also In re J.O.L., 409 A.2d 1073, 1075 (D.C.1979), vacated on other grounds, 449 U.S. 989, 101 S.Ct. 523, 66 L.Ed.2d 286 (1980).
We may reverse a trial court's determination of where the best interests of the child lie only when the judge has abused his discretion. In re D.I.S., 494 A.2d 1316, 1323 (D.C.1985), citing In re R.M.G., 454 A.2d 776, 790 (D.C.1982); Moore v. Moore, 391 A.2d 762, 770 (D.C. 1978); O'Meara v. O'Meara, 355 A.2d 561, 562 (D.C.1976). In reviewing for an abuse of discretion, our task is to ensure "that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor ..." and then "[to] evaluate whether the decision is supported by `substantial' reasoning ... `drawn from a *804 firm factual foundation' in the record." In re D.I.S., supra, 494 A.2d at 1323, quoting In re R.M.G., supra, 454 A.2d at 790.

B.
In essence, B.M. argues that the court abused its discretion by substituting the standards governing termination of parental rights set out in § 16-2353(b) for those governing consideration of an adoption petition set forth in § 16-309(b). Section 16-309(b) requires the judge to determine whether the prospective adoptee is suitable for adoption by the petitioner, D.C. Code § 16-309(b)(1), and whether the petitioner is capable of providing a suitable home and education. Id. § 16-309(b)(2). Despite the fact that some of the judge's oral and written findings and conclusions appear in the context of a § 16-2353(b) analysis, they demonstrate that he gave careful consideration to the physical and mental suitability of D.R.M. for adoption by the petitioner, and whether the petitioner would provide an adequate home and education for the adoptee. The judge entered detailed and specific findings concerning the fitness of the petitioner as an adoptive parent for D.R.M., her ability to meet D.R.M.'s physical and emotional needs, the suitability of her home environment, and the arrangements for day care, education and medical treatment which she had made for D.R.M. Under these circumstances, to disturb the judge's decision because he failed to invoke § 16-309(b) in making these findings would exalt form over substance.[19]
In addition to these specific factors, § 16-309(b) also poses the ultimate question: whether the adoption will be for the best interest of the child. § 16-309(b)(3). Because the statute provides no specific guidance as to this third factor, and because of the inherently "elastic" nature of the standard, we conclude that it permits the court to consider any factor which appears relevant under the circumstances to allow the judge "to make an informed and rational judgment, free of bias and favor, as to the least detrimental of the available alternatives." In re J.S.R., supra, 374 A.2d at 863. See In re D.I.S., supra, 494 A.2d at 1325 (decisions establish "flexible framework" for determining best interest of child; each case must be approached on its own terms).
For purposes of termination of parental rights, § 16-2353(b) "sets out four factors that delineate the best interests of the child...." In re K.A., 484 A.2d 992, 995 (D.C.1984). Because granting the adoption petition here carried the consequence of terminating B.M.'s parental rights, we can hardly say that the factors set out in § 16-2353(b) were irrelevant to determining the best interest of the child, or that the judge abused his discretion in applying them.[20] To the contrary, in a contested adoption the § 16-309(b)(3) standard *805 necessarily encompasses an inquiry into whether termination of the relationship between the child and the natural parents is in the best interest of the childan inquiry properly guided by the standards set out in § 16-2353(b).

III.
Indeed, the second part of B.M.'s attack on the judgment focuses not on the interest of the child, but on the termination of her own parental rights. Citing the judge's conclusion that "reunification" of the child with the natural parent was not at issue in the case because B.M. had never had custody of D.R.M., and only saw her for the first time after birth beginning in May 1987, she contends that the court disregarded her constitutionally protected right to raise her child. Yet, as appellant recognizes, the trial court in its oral conclusions of law noted the constitutional magnitude of her right to parent D.R.M., but correctly observed, in accordance with our decision in In re J.S.R., supra, 374 A.2d at 863, that the right is not absolute and that "the State has the right and the duty to protect minor children through determination of their interests." We have held that permanent termination of parental rights in an adoption proceeding does not violate the substantive or procedural due process rights of the natural parent when the court finds by clear and convincing evidence that the adoption is in the best interest of the child despite the parents' refusal to consent. In re P.G., 452 A.2d 1183, 1184-85 (D.C.1982); In re J.S.R., supra, 374 A.2d at 863-64. The requirement of the greater degree of factual certainty reflected in the "clear and convincing" evidence standard ensures that due regard is given to the fundamental liberty interests of the natural parent facing termination of parental rights. In re M.M.M., 485 A.2d 180, 184 (D.C.1984); cf. D.I.S., supra, 494 A.2d at 1326 & n. 17 (higher standard applies because of natural parent's constitutionally protected interest in raising own child; custodial non-parent can claim no such interest). Nevertheless, the interests of the natural parent are not to be considered in isolation from the needs of the child, which remain the decisive consideration. In re M.M.M., supra, 485 A.2d at 184, citing In re K.L.J., 434 A.2d 1004, 1006 (D.C.1981).
B.M. concedes that "there comes a point when a parent evinces so little interest in her child that her constitutional right to raise her offspring must yield to the welfare of the child and the concomitant obligation of the state to protect that welfare," but insists that that point had not been reached in this case. She contends that her pattern of visits with D.R.M. beginning in May 1987 constitute steps to reclaim her child that distinguish this case from other decisions upholding termination of parental rights in the adoption context, and that the judge failed to give adequate weight to this pattern of successful visits. On review, we must therefore determine whether a clear and convincing factual foundation supports the trial court's conclusion that the visits, in and of themselves, did not provide sufficient evidence to overcome the compelling case for termination of parental rights.
When extinction of parental rights is at stake, due process requires that the trial court "consider the quality of the relationship between [natural] parent and child." Id., citing D.C.Code § 16-2353(b)(3).[21] Testimony concerning the visits was the only evidence before the court providing any insight into the quality of B.M.'s relationship with D.R.M. While the visits, as the court found, "went well," on reviewing this evidence we are not persuaded that anything approaching a genuine *806 parent-child relationship had blossomed in the course of these visits. We observe that the court's findings as to the quality of the relationship between B.M. and D.R.M. are not articulated with the precision that we would prefer, but we conclude that the judge found the visits were too few and came too late to result in a relationship of such quality as to warrant a finding that terminating parental rights was not in D.R.M.'s best interest.
Noting that "[t]he [child's] `relationship' with her natural mother did not begin to develop until May 1987," the court found that "this is not a family that had any real time together," and that "this is not the type of case where we are rupturing a family relationship [or] ... a mother-daughter relationship."[22] Ample record evidence supports the court's conclusion that no bond of substance had emerged during the visits. Ms. Dixon, who supervised most of the visits, testified that B.M. behaved appropriately with the child during the first visit, but that D.R.M. acted "moderately fretful," apparently not recognizing B.M. as a relative or anyone she knew. During later visits, the child was comfortable with B.M. and went to her readily, and the two seemed to enjoy each other's company. B.M. read to D.R.M., played games with her, told her how pretty she looked, hugged and kissed her, and on one occasion changed her diaper. Nevertheless, Ms. Dixon could not say that a "relationship" had developed during the visits:
During the visits they had interaction, it was relaxed and calm. I think D.R.M. welcomed the opportunity to have playtime, and I believe she, in my opinion tended to recognize [B.M.] as she would maybe a counselor or day-care center teacher or something like that. If you want to qualify that as a "relationship", maybe, but certainly not much more than that.
Ms. Dixon and others testified that B.M. consistently attempted to get D.R.M. to call her "mommy" but, because of her young age, D.R.M. did not understand. Dixon testified that D.R.M. was easily separated from B.M. at the conclusion of the visits, perceived the petitioner as her mother, and would "sometimes during the visits call for mommy and look around. At the end of the visits when she would see [the petitioner], she would run to her ... and say `Mommy'." When asked whether she had seen any signs of a developing attachment to the child on B.M.'s part since the visits began, Dixon noted that "it's a very short time to try to say what her total level of commitment is" and "I have no idea what [B.M.'s] emotional level is," but that, given B.M.'s previous failures to act toward reunification, she questioned B.M.'s expressions of desire to parent D.R.M.[23] Beverly Clendenen, another social worker who was present during two of the later visits, confirmed Dixon's testimony that B.M. and D.R.M. had interacted well during the visits, but when asked to characterize B.M.'s relationship with her daughter, testified:
In terms of reaching the extent of that type of relationship, that I really can't say because I know the child recognized her, the child went to her freely. The child didn't display any type of fear towards her or anything of that nature. But I can't really distinguish how she would react differently to anyone else if she had the same amount of time with them. But I know with [B.M.] on that occasion it went very well. And that's about as much as I can say in terms of the relationship.
In light of this evidence, we conclude that the judge's finding that any relationship between B.M. and D.R.M. during the visits was insufficiently developed to justify, without more, denial of the adoption petition was supported by clear and convincing evidence, and we decline to disturb it on appeal. The visits reflected commendable stirrings of interest by the mother in raising D.R.M. But they began after nineteen *807 months of neglect, and they must be weighed against the mother's complete failure during the intervening period to attempt to secure a stable home environment, cooperate with agency officials, or meet the child's bodily, emotional and developmental needs. As the court expressly found, "[t]he natural mother has provided little or no evidence that she has the ability now, nor in the future, to care for a young child." When to this is added the court's finding that B.M. "suffers from mental health problems that prevent her from adequately caring for [the child]," it is simply not possible for us to say that the visits compelled further delay in resolving the infant's status in favor of a highly qualified adoptive parent with whom she had lived and bonded during the past year.[24]

* * * * * *
Although we thus affirm the order of adoption, there is one aspect of this case that gives us serious concern and requires further comment. DHS officials testified that when the mother had failed to establish a relationship with D.R.M. by October 1986, one year after the child's birth, a recommendation of adoption was made and the case was referred to the Adoption Branch for permanency planning. When asked whether such a referral "is cast in cement," and under what circumstances DHS might be prompted to reverse its course of action, Lastenia Brathwaite, a supervisory social worker, testified:

I cannot think of anything that really will prompt us to change our course of action, especially ifover a year if we have done a lot of extensive work in looking for the parent and looking for other relatives. When we reach the decision that this child needs to be placed for adoption and we make a referral to move towards placement, I doubt that there will be anything that could really change that because a parent will have to give some unusual reason why they have not maintained contact with their child for the agency to present to the Court that this should not be the course of action to be taken. [Emphasis added.]
Read literally, this testimony would mean that, in DHS's view, when the natural parent has established no relationship with the child for a year following birth, a virtual conclusive presumption arises in favor of adoption, and not very much the parent can do will dissuade DHS from that course. Were it indeed true that an adoption juggernaut is set in motion at this point, we would have strong doubts about the legitimacy of the process leading to termination of parental rights. There would be little point in stipulations such as the one B.M. entered into in late 1986, after the neglect adjudication, setting forth steps she was required to take for reunification; prospective reunion with the child would, in practice, be a fiction. DHS also, having elected for adoption, would have little incentive to assist the natural parent in designing and following through on a case plan looking toward reunification. Yet, as one social worker testified, the most significant component of a case plan may be the encouragement and support (the "good solid services") which the agency can provide in helping the parent meet the plan objectives. If DHS were committed irreversibly to adoption, there could be little enthusiasm on its part to provide the counseling and other help needed to overcome the neglect and indifference that have marked the parent's relation to the child in the past.
We are convinced, however, that although a danger arises of institutional ambivalence *808 (not to say schizophrenia) regarding reunification when DHS once commits itself to "permanency planning" for a child adjudged neglected, the record in this case does not demonstrate that the agency's interest in or efforts toward reuniting child with mother slackened after D.R.M. was placed in a potential adoptive home. As related earlier, B.M.'s social worker, Donna Dixon, pursued reunification with the mother continuously throughout 1987 until she left employment with the agency in September of that year.[25] Thereafter, Joan Lewis of the Adoption Branch "consistently inquired of [B.M.'s] social worker, give me something wherein ... the Adoption Branch ... might have to consider changing [its] recommendation," recognizing that the agency's "first goal is always to return the child to the birth mother." The trial court recounted the failed efforts to achieve B.M.'s compliance with the case plan objectives, except only for the visitations belatedly started. Although the court was sensitive to indications that DHS might structure circumstances so as to favor the potential adoptive mother,[26] nowhere in its findings did it question the good faith of the agency's efforts to fulfill the paramount goal of reunification.
The decree of adoption is, accordingly,
Affirmed.
SCHWELB, Associate Judge, concurring:
For me, it is a very extreme measure indeed to permit an unrelated person to adopt a child without the consent of the mother. Such a step is even more drastic where, as here, the mother has resumed contact with her daughter and has had more than a dozen comparatively successful visits with her, during some of which the mother hugged and kissed her child and told her how pretty she looked. Indeed, in my experience, children have usually been adopted, and parental rights have been terminated, when the children's contacts with their natural parents have decreased in number and quality or both, most often to nothing at all. Since the situation in this case is, in that respect, an unusual departure from the norm, the remarks of Lastenia Brathwaite, quoted by the majority at p. 807, certainly give me pause. Indeed, I share Judge Farrell's sense of a possible "adoption juggernaut," and I apprehend that the juggernaut might roll over the constitutionally protected rights of natural parents.
Despite these reservations, which I think my colleagues share, I join the court's judgment and opinion because Judge Mencher has, in effect, found that the mother is not able to care for the child, and because there is evidence in the record to support that finding. I think it worth stressing that the mother apparently admitted to having previously had an $800 per day cocaine habit, as well as a history of severe alcohol abuse. These afflictions are often accompanied by general untrustworthiness and a criminal lifestyle, and are not easy to cast aside. They certainly had the potential for substantially compounding the mother's psychological problems.
The judge did not make a specific finding as to the mother's level of use of cocaine or alcohol, nor did he explicitly assess the prospects of future substance abuse on her part. The mother's increased visitation with her daughter may have indicated an improved ability to cope and, in some measure, corroborated her testimony that she was not an abuser at the time of trial, or even earlier when her child was born. Nevertheless, the mother's overall history could well undermine the confidence of a reasonable trier of fact in her ability to care adequately for the child, whose interests *809 are always paramount. Accordingly, I join my colleagues in voting to affirm.
NOTES
[1] At the time of D.R.M.'s birth, B.M. was married to, but voluntarily separated from, a man serving in the United States Marine Corps. B.M. asserted that another man, not her husband, was D.R.M.'s father. During the neglect phase of the proceedings, both this man and B.M.'s estranged husband disclaimed any interest in caring for the child and filed voluntary notarized letters of non-paternity with the court.
[2] Judge Graae determined that shelter care for D.R.M. was necessary due to a lack of care and supervision of the infant child. See D.C.Code § 16-2310(b)(2); Super.Ct.Neg.R. 5(c), 6(b) (1989).
[3] See D.C.Code § 16-2301(9)(B) (child "neglected" when "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian or other custodian"); id. § 16-2320(a)(3) (transfer of legal custody of neglected child).
[4] Ms. Dixon and Joan C. Lewis, a social worker with the Adoption Branch, testified that "at risk" status denotes that although the placement is with persons wishing to adopt the child, the rights of the natural parents have not yet been terminated or waived. An at risk adoptive parent must agree to make the child available for visits by the natural parents and to obtain permission from the agency to take the child on out of town visits. Functionally, an at risk adoptive parent is similar to a foster parent: at risk adoptive parents take a child subject to the possibility of losing it to the natural parents. Ms. Lewis testified that D.R.M.'s status as an at risk placement was "not acceptable to several many [potential adoptive] parents."
[5] At the time the petition was filed, D.R.M. was a neglected child committed to DHS custody. A neglect adjudication and commitment "does not terminate parental rights, but merely determines custody of a neglected child for two years." In re B.K., 429 A.2d 1331, 1333 (D.C. 1981). The court, however, may also terminate rights as part of a neglect proceeding "for the purpose of seeking adoptive placement...." D.C. Code § 16-2320(a)(6). See also In re A.W., 569 A.2d 168 (D.C.1990).
[6] According to the report of the Social Services Commissioner recommending adoption, B.M. missed scheduled appointments with Ms. Dixon on November 27, 1985, December 11, 1985, January 3, 1986, March 17, 1986, March 31, 1986, April 2, 1986, August 6, 1986, December 23, 1986, and January 21, 1987. On April 15, 1986, Ms. Dixon contacted B.M. regarding a court status hearing which B.M. did not attend, and asked B.M. if she wished to meet to complete a case plan, to which the mother replied in the negative. On November 14, 1986, two letters, one via certified mail, were sent to B.M. encouraging her to contact her social worker to complete work on a case plan. The certified letter was signed for as received, but it is unclear whether B.M. signed for it.
[7] This consisted of a study of the petitioner's home environment, a physical examination of the petitioner, review of personal references, financial statements and marriage records, and a check of the national child abuse and neglect registry. Ms. Lewis also attempted to contact B.M.'s relatives to determine if any had an interest in raising D.R.M.
[8] "A final decree of adoption may not be entered unless the prospective adoptee has been living with the petitioner for at least six months." D.C.Code § 16-309(c). If in the best interest of the adoptee, the court may enter an interlocutory decree which automatically becomes final no less than six months after entry. Id. § 16-309(d).
[9] See note 5, supra.
[10] "The court may grant a petition for adoption without [parental] consent[] ... when the court finds, after a hearing, that the consent ... [is] withheld contrary to the best interest of the child." D.C.Code § 16-304(e). Although the petition was granted, the judge withheld entry of a decree of adoption until the expiration of the time for an appeal. See Super.Ct.Dom.Rel.R. 402(c) (1989).
[11] B.M. testified that she had taken and passed an examination administered by the District of Columbia Metropolitan Police Department.
[12] Lastenia Brathwaite, a supervisory social worker, testified that in DHS's experience the counseling and parenting classes are "very beneficial," including the services of a psychologist and a trained social worker. "[I]t's a program that's been functioning for a very long time and one in which we have had very good success...."
[13] At the hearing, B.M. asserted that DHS workers conditioned visitation on B.M.'s participation in development of a case plan. She testified: "I wasn't interested in doing a case plan. I wanted to see my daughter. After a long while, then [Ms. Dixon] told me I had to do that first before the other part would come, the visitations." In preliminary oral findings, the judge indicated that this suggestion troubled him, because B.M. had a legal right to visit the child regardless of whether she cooperated in developing a case plan. Ultimately, however, he found that, because the court's order in April 1986 and the stipulation both expressly provided for visitation rights, the "record belie[d]" B.M.'s contention that she had been impeded in exercising those rights.
[14] B.M. told Dr. Teplitz, while laughing, that she would like to be President; more seriously, she said that she would like to be president of a word-processing firm like her sister, although at present she worked in a fast-food shop.
[15] In her written report, Dr. Meyers explained that B.M. "is a seriously damaged woman who is very impulsive, immature and has a very undeveloped and damaged sense of herself.... Her ties with reality are tenuous, and are likely to be severely compromised when she is under emotional stress." For this reason, Dr. Meyers concluded that "[t]o place the child in the care of [B.M.] would appear to create a very high risk situation whereby the child would be vulnerable to the behavioral manifestations of [B.M.'s] psychiatric illness." All told, B.M. was "extremely unlikely to fulfill a parenting role with any degree of success...."
[16] D.R.M. was born with anemia, a heart murmur and an eye disorder. Petitioner arranged for coverage for D.R.M. under her medical insurance plan.
[17] This section provides:

In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relatives and/or caretakers, including the foster parent; and
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter.
[18] This section provides:

the [trial] court may enter a final or interlocutory decree of adoption when it is satisfied that:
(1) the prospective adoptee is physically, mentally, and otherwise suitable for adoption by the petitioner;
(2) the petitioner is fit and able to give the prospective adoptee a proper home and education;
(3) the adoption will be for the best interest of the prospective adoptee; and
(4) the adoption form has been completed by the petitioner pursuant to section 10 of the Vital Records Act of 1981.
[19] We note that the judge made no finding whether the petitioner had completed the appropriate adoption form as required by § 16-309(b)(4). While we do not mean to condone failures to make findings required by statute, the completed form was apparently before the court below and is in the record on this appeal, and we conclude that the omitted finding did not affect the substantial rights of the parties. See Super.Ct.Dom.Rel.R. 61.
[20] In In re D.I.S., supra, 494 A.2d at 1316, in which the court declined to reverse the denial of a foster parent's petition for adoption, we rejected an argument that two factors, continuity of care and "psychological" parentage, should be given dispositive effect in ascertaining the best interest of the child. Id. at 1324-25. We held instead that "each case must be dealt with on its own terms" and that attaching primary significance to one or two factors "runs counter to the flexible framework established in our cases for making this critical decision." Id. at 1325.

B.M. contends that, in determining that the adoption was in the best interest of D.R.M., the judge relied exclusively on continuity of care and quality of interaction with the natural parent and the caretaker (which B.M. asserts is the equivalent of psychological parentage). First, our review of the record reveals that the judge did not rely exclusively on those factors, but rather that he properly approached the case "on its own terms" and carefully and thoroughly reviewed the evidence in light of factors he deemed relevant. Moreover, we do not read our decision in D.I.S. to preclude the judge, in proper circumstances, from finding any one or combination of factors dispositive, but merely that we are not free on appeal to reverse the trial court's decision for failing automatically to give those factors dispositive weight.
[21] Our decisions leave an open question, as yet unresolved, whether a custodial natural parent has due process rights of greater magnitude in a termination proceeding than a noncustodial parent. See In re M.M.M., supra, 485 A.2d at 184 n. 4; In re K.A., supra, 484 A.2d at 997 n. 2, 998. Those decisions recognize the convergence of two important interests in that situation: the desirability of preserving a "family unit already in existence," In re K.A., supra, 484 A.2d at 997 n. 2, quoting Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978), and the fundamental liberty interest of the natural parent. We emphasize that because B.M. never had custody of D.R.M. from the time of her birth, preserving the sanctity of the family unit, at least to the extent that it applies to B.M., is an irrelevant consideration in this case.
[22] The court stated: "[H]ad those visits started... much longer ago and the bonding and all of the case plan, we might have a difficult result."
[23] Ms. Dixon did note that she believed B.M. was extending herself and trying to get D.R.M. to warm up to her, and that D.R.M. knew B.M. better at present than she had in May 1987.
[24] We find no merit in B.M.'s additional contention that the court relied improperly on her failure to fulfill the elements of the case plan as a basis upon which to grant the adoption petition. Her reliance on In re R.W., 495 So.2d 133 (Fla.1986), is misplaced. There, the Florida Supreme Court held unconstitutional a statute which allowed termination of parental rights solely on the basis of the parent's failure to abide by the equivalent of the case plan here. The trial court in this case did not rely on that sort of mechanical approach, but carefully considered the evidence under the multi-factor analysis required by § 16-2353(b). While B.M.'s failure to secure adequate housing and stable employment, and to demonstrate her practical and psychological capacity to be a parent, may have constituted a failure to comply with the case plan, the trial judge correctly focused on the bearing these and other facts had on B.M.'s ability to meet D.R.M.'s needs, not on the mere fact that they violated the case plan.
[25] The trial court specifically found that "Ms. Dixon continued her goal of reunification even after she formally referred the case to the adoption placement unit."
[26] The court was initially concerned that DHS conditioned visitation rights on the natural mother taking certain rehabilitative steps, but concluded that "the record belies that." See note 13, supra. The court was also troubled by an apparent "policy" of DHS of allowing the at risk adoptive mother to call the child another name than that given by the birth mother, but concluded that this "in and of itself would not prevent this adoption from going through."