711 A.2d 826 (1998)
In re J.D.W.
J.G. and A.G., Appellants.
Nos. 97-FS-310, 97-FS-1594.
District of Columbia Court of Appeals.
Argued March 19, 1998.
Decided May 14, 1998.
*828 Steven M. Schneebaum, with whom Laura C. Tayloe was on the brief, Washington, DC, for appellants J.G. and A.G.
William H. Thompson for appellees J.C.W. and H.W.
Judith A. Lovelace, Washington, DC, appointed by the court, filed a statement in lieu of brief for appellee J.D.W.
Before TERRY, STEADMAN and KING, Associate Judges.
STEADMAN, Associate Judge:
This is a case in which two pairs of prospective adoptive parents, both deemed fit, are competing to adopt a young child whose birth mother (who is not a party to this appeal) gave "consent" first to one pair and then, nearly a year and a half later, to the other. We are asked to reverse an order of the trial court granting the petition of the latter pair, appellees J.C.W. and H.W. (the "Wilsons")[1] to adopt J.D.W. (the "child"), a five-year-old child at the time of trial, and dismissing the petition of the former pair, appellants J.G. and A.G. (the "Grants").
The court's order followed a three-day trial on the competing petitions of the Wilsons, who are the child's maternal uncle and the uncle's wife, and the Grants, his foster parents of more than three years. The court, applying D.C.Code § 16-309(b) (1997), found that "a preponderance of the evidence of the best interests of [the child] favors allowing the [Wilsons] ... to adopt him." We affirm.

I.
The child was born to G.W. ("the mother") on March 10, 1991. His biological father, whose current whereabouts are unknown, has had no involvement with him since his birth and has provided no support. Immediately after his birth, the mother voluntarily relinquished custody and the child entered the foster care system, spending more than one year at St. Ann's Infant and Maternity Home and several months with a foster family. In December 1992, after a brief reunion *829 with the mother, she again relinquished custody voluntarily, whereupon District authorities placed the child into the foster care of the Grants. He lived with the Grants between that date and August 1996, when, pursuant to the adoption decree appealed from here, he began living with the Wilsons.
Mr. and Mrs. Wilson, the mother's brother and sister in-law, began visitation with the child in November 1993. Initially, they were permitted two one-hour visits per month under the supervision of the Catholic Charities organization. By October 1994 the visits were increased to one day every weekend at their home.
Mrs. Wilson testified that the mother called her and her husband in February 1994 and requested that they adopt the child. Mrs. Wilson indicated that they wanted to adopt the child, and that was the reason they had begun visitation at Catholic Charities. In her testimony, the mother confirmed that she had asked the Wilsons to adopt her son and that they had agreed to do so.[2]
Despite these discussions with the Wilsons, on November 2, 1994, the mother executed a written, notarized consent to the Grants to adopt her son. Accompanying the consent were two letters, one expressing gratitude to the Grants for agreeing to adopt and the other, addressed to the child, stating that the mother thought it in his best interests to become part of the Grant family. On the basis of the November 2, 1994, consent, the Grants filed their petition to adopt the child in February 1995.
At trial, the mother's motivation for giving consent to the Grants was probed. The mother herself testified that she signed the consent form as a way of "lashing out" and getting "revenge" against the Wilsons because "they weren't there" for her during a crisis in her life sparked by drug use.[3] She further indicated that when she gave her consent she believed that she could rescind it within one year. She claimed that she orally informed an official at Catholic Charities within the year after the consent that she had changed her mind and wanted the Wilsons to adopt her son.
Further calling the mother's intentions into question, Mrs. Wilson testified that she reported the mother to Family Protective Services on October 28, 1994less than a week before the mother executed the consent to the Grants for her son's adoptionfor allegedly neglecting her two other children. She also stated her belief that the mother had been using drugs during the time period when she granted the November 2, 1994, consent.
In August 1995, the Wilsons filed a petition to adopt the child. Shortly before trial on the consolidated petitions of the Grants and the Wilsons, the Wilsons produced a written consent, signed by the mother, favoring their petition.
The trial court held that the November 2, 1994, consent in favor of the Grants is "the only valid consent and cannot be withdrawn," citing In re J.M.A.L. v. Lutheran Social Services, 418 A.2d 133 (D.C.1980), and In re S.E.D., 324 A.2d 200 (D.C.1974). It further found by clear and convincing evidence that, at the same time, the mother's consent was withheld from the Wilsons contrary to the best interests of the child. As a consequence, the court concluded that it could consider the Wilsons' petition on the same footing as the Grants' pursuant to D.C.Code § 16-304(e) (1997). Finally, weighing the *830 preponderance of the evidence, the court held that the best interests of the child favored granting the petition of the Wilsons and consequently denying the petition of the Grants.
On appeal, the Grants advance three principal arguments. First, they agree with the conclusion regarding the November 2, 1994, consent, but contend that the court misapplied D.C.Code § 16-304(e) in concluding that the Wilsons' petition could be considered on equal footing to their own. On the contrary, the Grants argue, their petition could be denied only if they were deemed to be unfit adoptive parents. Second, the Grants assert that even if the Wilsons' petition could be considered under § 16-304(e), the court improperly applied the standard contained in that section, analyzing "withholding" of consent from the point of view of the mother's reasons rather than the child's best interests, and otherwise abused its discretion in concluding that consent was withheld contrary to the best interests of the child. Finally, the Grants maintain that the court considered improper factors and otherwise abused its discretion in finding that the best interests of the child called for adoption by the Wilsons over them. We address these arguments in turn.

II.
We repeat at the outset the oftstated principle that the trial court's legal determinations are reviewed de novo, District of Columbia v. Morrissey, 668 A.2d 792, 796 (D.C.1995), whereas findings of fact are reviewed under the "clearly erroneous" standard, In re L.L., 653 A.2d 873, 880 (D.C. 1995). At bottom, the "decisive consideration" in any adoption case is the best interests of the child, a matter left to the sound discretion of the trial court. See id.; In re L.W., 613 A.2d 350, 359 (D.C.1992). The statutory scheme governing adoption in the District is rather straightforward. "Any person may petition the court for a decree of adoption." D.C.Code § 16-302 (1997). Along with various requirements as to the petition's content, see D.C.Code § 16-305 (1997), the statute contains the additional proviso that "[a] petition for adoption may not be granted by the court unless there is filed with the petition a written statement of consent." D.C.Code § 16-304(a). Such a consent must, if applicable, be given by both natural parents. D.C.Code § 16-304(b)(2)(A).[4]
Notwithstanding this requirement for consent, "[t]he court may grant a petition for adoption without any of the consents specified in this section, when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child." D.C.Code § 16-304(e). After determining which petitions it may properly consider, the trial court must review the "petition, the consents, and such evidence as the parties and any other properly interested person may present" and determine, inter alia, whether "the adoption will be for the best interests of the prospective adoptee." D.C.Code § 16-309(b)(3) (1997). In the case of a contested adoption between two nonparents, the ultimate decision on whether granting a petition serves the adoptee's best interests is made by the preponderance of the evidence. See In re D.I.S., 494 A.2d 1316, 1326 (D.C.1985).

A.
The Grants first argue that in light of the mother's valid and irrevocable consent to the adoption of her son in their favor, the trial court erred in addressing the Wilsons' petition to adopt the child "as if it were one of a competing pair of essentially equal requests." They contend that the Wilsons could not avail themselves of D.C.Code § 16-304(e) because that provision only applies in a situation where a party seeks to adopt a child and consent is affirmatively refused. In their view, the mere granting of consent to one party, as done here, cannot by itself be construed *831 as a withholding of consent to others. Thus, they claim "there was no statutory authority for the [Wilsons'] petition."
Indeed, we have traditionally applied D.C.Code § 16-304(e) to cases where a party, often a foster parent or grandparent, petitions for adoption of a child and the child's natural parent objects. See, e.g., L.W., supra, 613 A.2d at 351 (biological father refuses consent to foster parents); In re D.R.M., 570 A.2d 796 (D.C.1990) (biological mother refuses consent to foster mother). The closest we have come to addressing the issue presented herewhether § 16-304(e) can avail a party who has effectively been denied consent by the natural parent only insofar as the parent has granted consent to another partywas in In re Baby Girl D.S., 600 A.2d 71 (D.C.1991).
In that case a child's foster mother and natural grandparents filed competing adoption petitions; the child's natural mother gave her consent to the grandparents. The guardian ad litem filed a petition to terminate the natural mother's parental rights ("TPR"), which the trial court denied. The foster mother intervened in the TPR case in favor of termination, seeking to vitiate the natural mother's consent to adoption by the grandparents, and appealed from the trial court's adverse ruling. Finding reversible error in the trial court's TPR decision, we ultimately remanded the case and ordered the consolidation of the adoption and termination matters.
On the issue of consent in adoption cases, we observed that "[w]hen there are competing petitions for adoption, there is a complex, unresolved question whether the child's noncustodial mother, whose parental rights have not been terminated, can dictate the result by consenting to adoption by one of the parties but not the other." Id. at 87. We left this question open, but with the comment that
even if ... the party who does not receive the mother's consent must prove by clear and convincing evidence that such consent is unreasonably withheld, in the best interest of the child, when that party seeks to adopt, this does not strike us as an inappropriate burden. We so conclude because that party would have to bear such a burden in any event if she were simply seeking to adopt, over the mother's objection, without confronting a competing petitioner. If a party can carry that burden, then the level playing field will be available vis-a-vis a competing petitioner, and the party who eventually is permitted to adopt will have to prevail by a preponderance of the evidence.
Id. at 89 (citations omitted).
In the case before us we must definitively answer the question posed in D.S., namely, whether a non-custodial natural parent conclusively dictates the result of a contested adoption proceeding by granting consent to one party. On the facts of the present case, we resolve this question in the negative. In doing so, we assume the proposition adopted by the trial court that the consent by the mother to the Grants was freely given and was otherwise nonrevocable.[5] We also answer the question solely in the context presented here, namely, two pairs of prospective adoptive parents both under active consideration at the time the consent was given, and a subsequent explicit consent by the mother to the other competing pair.[6]
*832 We see no reason to restrict the applicability of § 16-304(e) to the more common scenario of a natural parent affirmatively withholding consent to one party interested in adoption where, as here, the choice of the natural parent is made among two parties actively competing to adopt at the time the consent is given. Nothing in principle would prevent a birth mother from giving consent to a number of competing prospective adoptive parents. Where the consent of the natural parent in favor of one party is made to the express exclusion of another party actively engaged in adoption discussions with that parent, such exclusion is tantamount to a withholding of consent and may be treated as "constructive" withholding for the purposes of § 16-304(e).
Here, there can be no doubt that the mother's consent in favor of the Grants was made with the knowledge and, indeed, express intent that the Wilsons would not be permitted to adopt. Discussions between the mother and the Wilsons about the child's adoption had been ongoing and the mother emphasized that her express purpose in granting consent to the Grants was to lash out at the Wilsons. Denying consent to the Wilsons, she testified, was crafted to "put pain in them because I know they so much wanted to adopt my son."
On these facts, the trial court properly invoked § 16-304(e) to ascertain whether the mother withheld consent to the Wilsons contrary to the best interests of the child.

B.
Next, the Grants assert that the trial court erred in the manner in which it applied § 16-304(e), by focusing on the mother's reasons for withholding consent, not on the overall best interests of the child. Additionally, they argue that the record does not support the conclusion that consent was withheld from the Wilsons contrary to the best interests of the child.
"We may reverse a trial court's determination of where the best interests of the child lie only when the judge has abused his discretion." D.R.M., supra, 570 A.2d at 803. Our review is also addressed to whether "the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor," and whether the decision is supported by a "firm factual foundation" in the record. See In re R.M.G., 454 A.2d 776, 790 (D.C. 1982) (internal quotation marks omitted). In examining the trial court's determination as to the withholding of consent to the Wilsons, we recognize that the best interests standard "is flexible and not susceptible to ready definition; `it must of necessity contain certain imprecision and elasticity.'" D.R.M., supra, 570 A.2d at 803 (quoting In re J.S.R., 374 A.2d 860, 863 (D.C.1977)). We think that the trial court here properly exercised its discretion.
In the ordinary case where consent is withheld, the trial court must apply a clear and convincing evidence standard to determine whether a non-parent's adoption petition can be considered despite the biological parent's decision to deny consent. See In re Baby Boy C., 630 A.2d 670, 682 (D.C. 1993); D.R.M., supra, 570 A.2d at 803; D.I.S., supra, 494 A.2d at 1326 n. 17. This high burden is constitutionally mandated. Because an adoption over the natural parent's objection effectively terminates that parent's interest vis-a-vis the child against his or her will, the natural parent enjoys constitutional protections that may not be overridden without careful examination of factors designed to ascertain the best interests of the child. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); L.W., supra, 613 A.2d at 355-61; D.I.S., supra, 494 A.2d at 1326. Additionally, in the usual case, the trial court's analysis under § 16-304(e) tends to be combined with the consideration of the § 16-309(b) factors, resulting in the court's ultimate decision on whether or not the granting of an adoption petition is in the child's best interests.[7]See *833 Baby Boy C., supra, 630 A.2d at 682; D.R.M., supra, 570 A.2d at 803-04; L.W., supra, 613 A.2d at 355-59. The overall analysis centers on the child and whether the proposed adoption serves his or her best interests.
Here, however, we have the unusual situation of a natural mother first denying consent and then later granting it to a party, but at the time of the denial purposefully withholding consent. The "best interests" test of § 16-309(b)(3) was, at bottom, not between natural parent and prospective adoptive parent but rather between two prospective adoptive parents. In such circumstances, we think that the trial court permissibly focused its decision under § 16-304(e) principally on the mother's reasons for withholding consent to the Wilsons. Those reasons ultimately bore directly upon whether the withholding of consent was indeed at the time motivated by and in the "best interests" of the child.
The record supports the court's finding that the mother "gave little or no thought to the best interests of her son. . . . She was addicted to drugs, refusing treatment, depressed, and without a stable home. . . . By her own testimony, she withheld her consent from her brother and his wife out of revenge, not out of concern for [the child]." The court continued,
[The child] had been visiting regularly with the [Wilsons] for a year at that point and [the mother] knew that a relationship had been established. Although she also knew the [Grants] were approved foster parents, she had never seen their home or how they were caring for and interacting with [the child]. She made no comparison between the relative merits of the [Grant] home and her brother's home. She simply wanted to hurt her brother because she was angry with him for not supporting her drug addicted life style. She acted impulsively and childishly, contrary to the best interests of her child, in choosing the [Grants] over the [Wilsons] as a way of lashing out at her brother.
Accordingly, and without abuse of its discretion, the trial court found "by clear and convincing evidence that the birth mother's consent was withheld contrary to the best interest of the child." As the court's decision forcefully demonstrates, the mother effectively denied consent to the Wilsons out of anger and spite, not for the child's best interests.

C.
Finally, the Grants maintain that the trial court considered improper factors in resolving the issue of which petition, after deciding to view them from equivalent positions, promoted the child's best interests. The Grants make two contentions: (1) that the trial court improperly based its decision on facts not presented through trial testimony but instead through sealed reports to which the parties were refused access, and (2) that even if the trial court could consider such facts, the court erred in treating the religious, educational, and financial backgrounds of the respective parties as dispositive factors in its best interests analysis. We perceive no reversible error.
1. The Sealed Reports: With regard to the first argument, the Grants list various facts which they claim the trial court relied upon but which were never testified to at trial. Such facts include certain information relating to the parties' respective religious affiliations, descriptions of their homes, educational levels, and financial resources. The Grants suggest that the court learned of these facts solely through reports submitted by the D.C. Department of Human Services ("DHS"), which were unavailable to the parties.
*834 Indeed, after testimony had been taken at trial, the parties discussed with the court the extent to which it could rely on agency reports.[8] The court indicated that it would consult the reports, but would not place much emphasis on them without input from the parties: "It's doubtful that there will be anything earthshaking [in the agency reports] that hasn't already come out in testimony. . . . [I]f I come across something that is the lynch pin [sic] of my decision that you are not aware of, I will certainly give you an opportunity to confront it."
D.C.Code § 16-311 (1997) affords the trial court broad discretion over the inspection of an adoption proceeding record:
From and after the filing of the petition, records and papers in adoption proceedings shall be sealed. They may not be inspected by any person, including the parties to the proceeding, except upon order of the court, and only then when the court is satisfied that the welfare of the child will thereby be promoted or protected.
(Emphasis added.) See also In re Adoption of Female Infant, 237 A.2d 468, 470 (D.C. 1968). There is no indication that the trial court abused its discretion here in denying the Grants' motion to inspect the agency reports and the Wilsons' petition. Under ideal circumstances the parties would be made privy to all relevant information so that they can present their case most effectively. To be sure, the adversary process and the interests of fairness might ordinarily be best served by full disclosure. However, in adoption cases these values must be balanced by the need for confidentiality and the general concern for the protection of the child's welfare. Here, it does not appear that the trial court placed principal reliance on the facts which the Grants say came from the agency reports. Most significantly, the Grants make no proffer that they presently dispute the veracity of these facts. They have come forward with no information which they could present, should a remand be ordered, to meaningfully counter any inferences made by the trial court from these facts.
2. Best Interests Analysis: As to the Grants' second argument, we note the trial court found that "[b]oth families are fit to care for [the child]. Both families live in acceptable homes and neighborhoods and are described by friends and associates as loving and nurturing of children. [The child] is fortunate to have such fine families competing for him." Neither of the parties challenges this determination. Because both families were deemed qualified to adopt the child, the trial court in deciding on the child's best interests, in all cases a highly discretionary call, could take note of factors which might otherwise be of little or no import. See D.R.M., supra, 570 A.2d at 804 (holding that court may consider "any factor which appears relevant under the circumstances to allow the judge to make an informed and rational judgment") (internal quotation marks omitted); D.I.S., supra, 494 A.2d at 1323-24 (holding that trial court "exercised its discretion within the range of permissible alternatives" where "financial resources" was one factor considered).
We do not read the court's references to the religions of the two pairs of parents as anything other than a factual observation. We also disagree with the contention that financial and educational resources were "dispositive" factors in the court's analysis. The court did state, "[a]lthough their [the Wilsons'] higher level of education and higher income would not alone be deciding factors, when those advantages happen to coincide with blood relationship, they certainly favor placement with the relatives." But the court in coming to its decision considered the totality of facts and in the final analysis concluded that despite the continuity and consistency offered by the Grants, the Wilsons "offer a return to family and the assurance to [the child] that his family has not *835 abandoned him."[9] It further stated that the Wilsons "are not strangers. They have been a part of [the child's] life for two and a half years. They are relatives."[10]
In sum, we can find no abuse of discretion in the trial court's approach and decision in this Solomonic case.
Affirmed.
NOTES
[1] As is customary in adoption cases, we identify the parties only by initials. For ease of following the discussion, we have identified them by substituting presidential surnames. We have used descriptive terms for the child and his birth mother.
[2] On cross-examination the mother stated as follows:

Q: Okay. You were talking with him [Mr. Wilson] about the possibility of adopting [the boy], correct?
A: Okay, yes.
Q: And did they indicate that they wanted to adopt [the boy]?
A: Yes.
Q: And did you indicate that you wanted them to adopt [the boy]?
A: Yes, I did.
[3] She stated,

A: ... I just wanted to hurt them because I was hurting.
Q: Why were you trying to get revenge against your brother and sister-in-law?
A: I was hurting. I was lonely. And I just needed somebody. That's all. And they weren't there for me, so I just wanted to hurt them back.
Q: And the hurting of them was making sure they were not going to get [the boy]?
A: Yeah. I felt that would put pain in them because I know they so much wanted to adopt my son.
[4] In the instant case, the trial court determined that it was unnecessary to secure the consent of the boy's natural father under the statutory provision for parents who "cannot be located[] or ha[ve] abandoned the prospective adoptee and voluntarily failed to contribute to his support for a period of at least six months next preceding the date of the filing of the petition." See D.C.Code § 16-304(d). The parties do not challenge this determination.
[5] Our precedents greatly limit the ability of a parent to rescind a valid consent. See J.M.A.L., supra, 418 A.2d at 135; S.E.D., supra, 324 A.2d at 201-02. A substantial focus of the trial was the validity of the consent by the birth mother. The Grants complain that the theory ultimately adopted by the trial court, that of reliance on § 16-304(e), came up for the first time in closing argument and hence they were deprived of their due process right to present evidence on that issue. The use of such a ground in this sort of situation was already foreshadowed by the above-quoted dictum in D.I.S. The pretrial discovery order informed them that the court would "hear all of the facts and circumstances of the lives and relationships of the petitioners and the child and make a determination as to what adoption was in the best interest of the child." Nor have the Grants come forward with any details as to new facts they would have developed to address the § 16-304(e) issue.
[6] Thus, there is no question here, given the outcome of this appeal, of any infringement upon any right of a natural parent to object to a particular proposed adoption or otherwise to participate in decision-making relating to the rearing of a child. See In re F.N.B., 706 A.2d 28, 31 (D.C. 1998); In re T.J., 666 A.2d 1, 11 (D.C. 1995).
[7] D.C.Code § 16-309(b) provides in relevant part: After considering the petition, the consents, and such evidence as the parties and any other properly interested person may present, the court may enter a final or interlocutory decree of adoption when it is satisfied that:

(1) the prospective adoptee is physically, mentally, and otherwise suitable for adoption by the petitioner;
(2) the petitioner is fit and able to give the prospective adoptee a proper home and education;
(3) the adoption will be for the best interests of the prospective adoptee; and
(4) the adoption form has been completed by the petitioner pursuant to section 10 of the Vital Records Act of 1981.
[8] Prior to trial, the Grants had made a motion for leave to inspect the court file. In denying the motion in an April 30, 1996 order, the court invited the Grants to "make a mid-trial motion for [an] opportunity to call additional witnesses if surprised by information they are unprepared to meet." We are not cited to any part of the record showing that the Grants in fact made such a follow-up motion.
[9] We find unpersuasive the Grants' argument that the court's reliance on the blood relationship between the Wilsons and the child "appears to be based exclusively on the Government recommendation in favor of relatives as a policy matter," an item the parties did not have access to. It is not improper for the court to consider blood relationship as a factor in making the "best interests" determination. See, e.g., T.J., supra note 6, 666 A.2d at 14.
[10] In this regard, the court noted the further fact that the boy's half-sister, ten years old at the time of trial, was living with the Wilsons. Cf. T.J., supra note 6, 666 A.2d at 14 (that the prospective adoptive parent, the child's great-aunt, also has custody of the child's natural sister is a factor favoring placement with the great-aunt).