884 A.2d 1072 (2005)
In re J.L. and R.L.; D.J., Appellant.
Nos. 04-FS-832, 04-FS-833.
District of Columbia Court of Appeals.
Argued March 17, 2005.
Decided May 19, 2005.
*1073 Lauren S. Kahn, McLean, VA, for D.J., appellant.
*1074 Stacy L. Anderson, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee.
Sharon Taylor Smith, appointed by the court, for adoption petitioners, J.L. and R.L.
Donald E. Exner, Greenbelt, MD, as guardian ad litem for L.J. and T.J.
Before SCHWELB, RUIZ and REID, Associate Judges.
RUIZ, Associate Judge:
D.J., the appellant, challenges the Superior Court's decision to waive her consent to the adoption of L.J. and T.J., her minor children, by J.L. and R.L., a married couple.[1] Concluding that the trial judge properly considered the evidence presented for his review, and did not abuse discretion in reaching his decision, we affirm.

I.

Statement of the Case
The evidence at trial consisted primarily of the testimony of three caseworkers from the Child and Family Services Agency (CFSA) who had been involved with the case. The court first heard from Tabitha Kelly, who had been assigned to the case from February 2001 until October 2002. Ms. Kelly testified that during the course of "countless conversations," "at least once or twice a week" with D.J., she became aware of the mother's drug use. As a result, Ms. Kelly referred Ms. J. to several out-patient drug counseling programs, but noted that she had not ever fully complied with the requirements of any. In fact, Ms. J. tested positive for the presence of drugs several times throughout 2001. In addition, Ms. Kelly noted that although there was scheduled weekly visitation "historically Ms. J. was at least 30 minutes late for most of her visits," and Ms. J. also missed about one visit per month. In conclusion, she observed that "Ms. J. just  she can't stay sober. And she can't parent her children. She's not available to her children."
Ms. Kelly also testified that the reason why the children had come to the attention of CFSA was that in 1999, M.E., the children's stepfather, had struck T.J. causing an hematoma to form over the child's left ear. Following that incident, the children were returned to their mother with the caveat that they could not be left alone with M.E. However, when in March 2000 Ms. J. was arrested and jailed overnight, the children were removed, so as to keep them from M.E.'s sole care. In June of that year they were found to be neglected as a result of Ms. J.'s drug use. Once placed in the Ls.' care, the children had a "warm, loving" relationship with their foster parents and bonded well with their foster siblings.[2] As a result, Ms. Kelly testified, although the children initially wanted to return to their mother's care, L.J. and T.J. "were clear if they could not be with [their] mom, they wanted to be with the petitioners."
Another CFSA caseworker, Natalie Walker, also testified for the petitioners. Ms. Walker had been assigned to the case from October 2002 until April 2003. Like Ms. Kelly, Ms. Walker informed the court that Ms. J. was "inconsistent" in her visits, and "often showed up to the visits very *1075 late, or sometimes the visits were cancelled because they didn't show up and the Ls. weren't aware of them not coming. So it was  that was basically the nature. Either she arrived late or didn't arrive at all." Ms. J.'s failure to visit regularly caused the children to become "very disappointed because they wanted to see her." Ms. Walker also told the court that at one visit Ms. J. asked the children with whom they wanted to live, and they had told their mother that they preferred living with their foster parents. In the wake of this occurrence, Ms. J. "had given the indication that she felt that they kind of betrayed her because they were choosing Ms. L. over her." Ms. Walker testified that the foster parents provided a "very nurturing, very family-like environment. I think that Ms. L. has gone above and beyond in trying to create a family setting for them and making them feel a part of the family."
The third witness for the petitioners was Karra Hancock, who was the CFSA caseworker assigned to the case at the time of the hearing, and had handled the case since July 2003. Ms. Hancock testified that the children had told her only ten days before the hearing that "they would like to continue to live with Mr. and Mrs. L." and "have not asked me to return to the care of their mother." On cross-examination, Ms. Hancock was even more specific, stating that in her last visit with the children, they "told me that they did not want to go with [their mother]."
The petitioners also called D.J. as a witness. Ms. J. admitted that she had previously pled guilty to possession of heroin, and had not completed a required detoxification program. She also admitted that her children had told her that they wanted to live with the petitioners "until I was able for them to come home." The mother informed the court that although she has had a substance abuse problem for over twenty years, "I've been dealing with it off and on, off and on and staying clean." During that time, she said, "I've always loved and took care of my kids. I want my children."
M.E. was called as a witness by D.J. He denied having hit T.J. in the incident that led to the first neglect petition. Mr. E. was of the opinion that although he was aware of Ms. J.'s drug use, she was "a very good mother."
The court took judicial notice of the fact that on July 28, 2000, Judge Dorsey had entered a written order in which he found L.J. and T.J. to have been neglected within the meaning of D.C.Code §§ 16-2301(9)(B) and (C). This adjudication was based on evidence that the police had executed a search warrant at Ms. J.'s home and "found empty ziplock bags with residue, a cut straw, crack pipes, a Xanax pill in a pill box, and at least 30 prescription pill bottles." As a result, "the children lived in an environment littered with drug paraphernalia, including open pill bottles, empty ziplocks with drug residue, cut straws, and crack pipes."
After considering this evidence, the trial judge found that "D.J. had a drug addiction and that her addiction had a direct impact on her ability to discharge her parental responsibilities." The judge also found that D.J.'s participation in detoxification programs was "sporadic," and that her drug dependency continued. Additionally, he noted that "Ms. J. has at times been very inconsistent with her visits with the children." The trial judge also found that once the two children were placed with the Ls., "they have treated L. and T. as their own, incorporating the children into all family activities. They have taken the children with them on family trips to Florida and New York. L. and T. have bonded and developed positive relationships *1076 with the petitioners' 2 biological children who reside in the same home. The children interact with each other as siblings. L. and T. have expressed a desire to stay with J.L. and R.L. on a permanent basis. They refer to the petitioners as mom and dad."
Summing up the evidence, the trial judge noted that the Ls. "have provided the children with a stable and permanent family home" for nearly four years. Despite sincere efforts, Ms. J. "ha[d] not shown that she can stay sober," and her "inability to embrace sobriety" demonstrated an inability to provide for the children's physical, mental, and emotional needs. Thus, the trial judge concluded, "the evidence is clear that the quality of the interaction and relationship between the children [and the Ls.' family] is positive, constructive and healthy," whereas "Ms. J. does simply not appear as strong, reliable and stable." With respect to the children's desire, the judge concluded that "at the onset, it appears that the children were willing to stay with the petitioners, as long as they could not be reunited with their mother. But as time went by, the children grew older, resolved in awareness of what was happening. They have come to embrace the petitioners as their parents, and have requested through either [sic] statements of the social workers, that the connection between the petitioners and the children become [in] legal terms, a permanent one." Lastly, the judge considered the fact that "drugs were still present in the home from which the children were removed." Considering these factors, the judge "f[ound] that there is clear and convincing evidence that Ms. J. [is] witholding her Consent to Adoption contrary to the best interest of the children," and waived her consent.
A final adoption decree was entered on May 12, 2004, and a timely appeal was filed by Ms. J.

II.

Applicable Legal Standards
"A petition for adoption may not be granted by the court unless there is filed with the petition a written statement of consent," D.C.Code § 16-304(a) (2001), given by the prospective adoptee's parent. D.C.Code § 16-304(b)(2)(B). The parent's consent may be waived by the court, however, upon a finding that the consent is being "withheld contrary to the best interest of the child." D.C.Code § 16-304(e). This determination is to be made based on clear and convincing evidence. See In re J.S.R., 374 A.2d 860, 864 (D.C.1977) (establishing the clear and convincing evidence standard as the quantum of proof for determining whether the withholding of consent is contrary to the child's best interests). Because the granting of an adoption over the objection of the natural parent necessarily curtails that person's parental rights,[3] the court must weigh the factors considered in proceedings to terminate parental rights under D.C.Code § 16-2353,[4] *1077 before the adoption petition will be granted. See In re P.S., 797 A.2d 1219, 1223 (D.C.2001) (citing cases).
It is important to note that the court's inquiry is not to determine whether the adoption petitioners would be better parents, or would provide a better home for the children. Even after children have been found to be neglected, the birth mother retains an important and essential liberty interest in raising her children, and "[t]he termination of parental rights is a `drastic remedy' and may be ordered only upon a showing of `clear necessity.'" In re J.G., 831 A.2d 992, 1000 (D.C.2003) (quoting In re A.S.C., 671 A.2d 942, 951 n. 14 (D.C.1996) (other citation omitted)). Thus, this interest may be overridden only if there is clear and convincing evidence presented that continuing the parent-child relationship would be contrary to the best interests of the children, and not merely that the adoption would be more beneficial to their interests. As this court has noted, transferring custody of children from the natural parent to another:
was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.
Id. (quoting In re T.W., 732 A.2d 254, 262 (D.C.1999) (quoting In re Rinker, 180 Pa.Super. 143, 117 A.2d 780, 783 (1955))). Parental rights, therefore, may not be terminated solely because of "poverty, ill-health, or lack of education or sophistication," but only upon a high showing that "such a drastic measure is necessary in order to protect the best interests of the child." Id. at 1001. We review the trial court's ultimate determination for abuse of discretion. See In re D.R.M., 570 A.2d 796, 803 (D.C.1990).

III.

Analysis
Though the appellant argues that the evidence at trial does not support the trial judge's decision to grant the Ls.' petition for adoption without her consent, her primary claim is that the trial judge erred in hearing the children's opinions through second-hand accounts, rather than directly from the children. We conclude that the judge did not err in considering the evidence of the children's desires presented by the social workers, that there was clear and convincing evidence supporting the decision to waive D.J.'s consent, and that the trial judge did not abuse discretion in granting the Ls.' petition for adoption.
The first factor which the judge was to consider was the children's "need for continuity of care and caretakers and for timely integration into a stable and permanent home." D.C.Code § 16-2353(b)(1). *1078 The judge found that this statutory factor weighed in favor of waiving the mother's consent to adoption because the Ls. "have provided the children with a stable and permanent family home" for nearly four years, whereas, despite sincere efforts, Ms. J. "ha[d] not shown that she can stay sober," and her "inability to embrace sobriety" demonstrated an inability to provide for the children's physical, mental, and emotional needs. Additionally, the judge found that T. and L. had bonded with the Ls. and their children. The mother does not challenge these findings on appeal, but rather argues that adoption should not be granted, and she should be allowed additional time to address her drug problem and eventually regain custody of the children. This argument, however, contravenes the "strong public policy, enhanced by federal legislation, disfavoring the protracted retention of children in foster care, and a `wait and see' option indefinitely deferring adoption or termination of parental rights . . . ." In re J.G., 831 A.2d at 1001 (citing In re L.L., 653 A.2d 873, 887-89 (D.C.1995)); see also In re T.M., 665 A.2d 950, 952 n. 3 (D.C.1995). The children had been in the Ls.' care for four years at the time of the hearing, and "a stable and desired environment of long standing should not lightly be set aside...." Rutledge v. Harris, 263 A.2d 256, 257-58 (D.C.1970). In short, the evidence showed that the children had been integrated into a stable and positive environment, and the mother conceded that she is unable to offer such an environment either at this time or in the near future. Thus, the judge did not abuse discretion in concluding that this factor weighed in favor of waiving the mother's consent to the adoption.
Considering "the physical, mental and emotional health of all individuals involved," D.C.Code § 16-2353(b)(2), the judge found that the birth mother was currently unable to address the children's physical, emotional and mental needs, while the Ls. were attentive to these demands. This finding is supported in the record. Thus, there is no abuse of discretion in the judge's weighing this factor in favor of waiving the mother's consent.
With respect to "the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent," D.C.Code § 16-2353(b)(3), the trial judge found that "the evidence is clear that the quality of the interaction and relationship between the children and the [Ls.] is positive, constructive and healthy." The judge also found that the children had formed similar positive bonds with the Ls.' natural children. These findings are supported by the testimony of the CFSA caseworkers, who uniformly testified as to the positive relationship between L. and T. and their foster family, and the children's frustration resulting from Ms. J.'s habitual lateness for visits and history of missed visits. Thus, the evidence fully supports the judge's determination that this factor weighs in favor of waiving the mother's consent to the adoption.
The mother's primary assignment of error concerns the trial judge's assessment of the children's opinion of their own best interests.[5] The trial judge concluded that *1079 over time, as they understood their mother's situation and found themselves a part of petitioners' home, L.J. and T.J. had come to prefer to live with petitioners on a permanent basis. They had expressed their preference to the social workers, who testified to that effect during the hearing. The mother does not challenge the correctness of the judge's determination on the evidence presented, but rather challenges the manner in which this evidence was introduced into the record. She argues that "when the statute says that the children's views should be considered, it should mean what it says and not be left to social workers to tell the court what older children want." Specifically, she notes that her children were eleven and thirteen years old at the time of the hearing and were old enough to voice their own opinions.[6]
Appellant's argument must be understood in the context of the judicial role in these proceedings. In In re A.R., the natural father argued that the trial judge "erred in refusing to consider [A.R.'s] opinion as to what his best interests are," because the judge did not interview the child. 679 A.2d 470, 474 (D.C. 1996). There, we noted that the judge's statutory duty to consider evidence of the child's opinion does not transform into any "obligation to investigate the case on the judge's own initiative . . . ." Id. at 475. At the same time, we also recognized that the judge in this kind of case "acts as parens patriae on the child's behalf, and `should do her (or his) best to obtain all of the information needed to effect a judicious disposition.'" Id. at 476 (quoting In re L.W., 613 A.2d 350, 353 n. 6 (D.C.1992)). We held that the trial court did not abuse discretion in deciding not to question the child directly because "the parties were `perfectly free' to present evidence with regard to the child's opinion, and ... counsel could [have] call[ed] the child as a witness if they elected to do so." Id. at 475. In this case, unlike in In re A.R., the social workers presented evidence of the children's opinion, and there does not appear to have been any impediment prohibiting the mother from calling the children as witnesses, so as to more directly ascertain their opinions.[7] Under A.R., we cannot shift the onus to further develop the evidentiary record, by calling the children, onto the trial judge.
Appellant's more specific argument, that the judge must ascertain the opinion of the child through that child's direct testimony, has been rejected by this court. See In re T.W., 623 A.2d 116, 117 (D.C.1993); In re I.B., 631 A.2d 1225, 1232 (D.C.1993). In In re T.W., the court noted that "[t]he statute does not say the judge must derive this opinion even partly from the questioning of the child herself . . . ." 623 A.2d at 117. "Indeed, common sense suggests that in many cases the most probative evidence of the child's opinion may *1080 lie in statements the child has made to others such as psychologists or in the child's past behavior, rather than in testimony given in the formal surroundings of a court proceeding." Id.; see also I.B., 631 A.2d at 1231. We reiterate, however, that "it is preferable for judges to hear directly from the children involved in such proceedings if it is at all feasible to do so." Id. at 1232. The matter is within the judge's discretion, taking into account whether children are old or competent enough to voice an opinion. See id. Although the children in this case, because of their age, might well have been able to express their opinions to the court, there was evidence presented not only though the social workers, but from the mother herself, that the children did not want to return to live with her under the conditions that prevailed when they were removed from her care. These conditions remained as Ms. J. had not been able to overcome the drug addiction that had resulted in the children's neglect. We also note that the children's guardian ad litem supported the Ls.' petition both in the Superior Court and in this court. Given that the guardian ad litem is appointed to represent the children's interests, see D.C.Code § 16-2304(b)(5), it is reasonable to infer from his position that the children prefer to be adopted by the Ls. If the mother thought otherwise, she could have called the children as witnesses. Thus, we conclude that the trial judge did not abuse discretion in ascertaining the children's wishes from the evidence presented, and finding that this factor weighed in favor of waiving the mother's consent to the adoption.
Lastly, the trial court was to consider "evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided ...." D.C.Code § 16-2353(b)(5). The trial judge noted that "drugs were still present in the home from which the children were removed." The mother has frankly admitted that her struggles with drug dependency continue, and has not alleged a lack of intervention or services. "Evidence of continued drug-activity shall be given great weight." Id. Thus, the trial judge did not abuse discretion in relying on this factor as also militating towards granting the adoption petition.
For the reasons expressed above, we conclude that the trial judge did not abuse discretion in waiving appellant's consent to adoption and granting the Ls.' petition to adopt the appellant's children.
Affirmed.
NOTES
[1] The children's birth father, C.W., is presently incarcerated, and has filed an affidavit consenting to the adoption by the Ls.
[2] Ms. Kelly testified that at the time she was involved in the case the Ls. had two children of their own residing with them, as well as another foster child.
[3] These rights are of such grave importance that they are classified as fundamental. See Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
[4] These factors include:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages; (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child; (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; (3A) the child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child; (4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and (5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to section 106(a) of the Prevention of Child Abuse and Neglect Act of 1977, effective September 23, 1977.... Evidence of continued drug-activity shall be given great weight.
D.C.Code § 16-2353(b).
[5] Appellant also mentions that the trial court should not have decided the case without testimony from the adoption petitioners, rather than relying solely on the social workers' testimony about them and their home life with L. and T. The transcript of the show cause hearing at which Judge Puig-Lugo considered whether the mother's consent should be waived shows that neither petitioner testified at that hearing, and we have no record indication that they testified at any other proceedings in this case. Although receiving testimony from the petitioners might well be the better practice, we do not think it is compelled in a case where three social workers provided comprehensive information based on their personal observation of the petitioners.
[6] As appellant notes, once a child is fourteen years old, adoption cannot be granted without the child's express written consent. See D.C.Code § 16-304(b)(1).
[7] Though the evidence of the children's wishes came via second-hand sources, no hearsay objection was made at trial, nor is one asserted on appeal. Thus, the trial judge was free to fully consider this evidence. See Clyburn v. District of Columbia, 741 A.2d 395, 397 n. 1 (D.C.1999) ("Hearsay evidence admitted without objection may be properly considered by the trier of fact and given its full probative value.") (quoting Mack v. United States, 570 A.2d 777, 782 (D.C.1990) (citation omitted)).