**In re PETITION OF W.D. & M.A.D.**

**M.M., Appellant.**

**No. 08–FS–1197.**

District of Columbia Court of Appeals.

Argued Nov. 30, 2009.

Decided Jan. 28, 2010.

Amrutha Rode, for M.M.

Alice V. Stevens, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for the District of Columbia.

Before BLACKBURNE–RIGSBY and OBERLY, Associate Judges, and SCHWELB, Senior Judge.

OBERLY, Associate Judge:

M.M., the biological mother of T.M, challenges the adoption of T.M. by W.D. and M.A.D., a married couple. On appeal, M.M. argues that the trial court erred in waiving her consent to the adoption. (The biological father, S.G., has consented to the adoption.) "We recognize," as we always do in such cases, that "it is no small matter for a court to permit the adoption of a child over the objection of a mother who loves him." *In re J.G.*, 831 A.2d 992, 1004 (D.C.2003). But because we are not persuaded that the trial court abused its discretion in reaching its decision, we affirm.

## I.

T.M. was born on August 18, 2004 to M.M. and S.G. The adoptive mother, M.A.D. (who, by the date of the hearing was seventy years old and married to seventy-four-year-old W.D.), first met T.M. when T.M. was less than one year old. M.A.D. was introduced to T.M. through A.D.—M.A.D.'s granddaughter and T.M.'s

godmother. According to M.A.D., T.M. would spend "quite a bit of time" in the D.s' home, including staying over for the night. The mother knew about these visits.

According to a Report and Recommendation filed by the Child and Family Services Agency,[1] T.M. "came to the attention of CFSA due to neglect" on August 2, 2006 after the Mary McLeod Bethune Charter School reported that the birth mother failed to pick up T.M.'s brothers from school. The school claimed that the brothers frequently arrived to school dirty and inadequately dressed, and that one of the brothers "had spots on the left side of his face that appeared to be bruises"; this brother "admitted to being struck, but would not reveal by whom." Ultimately, the brother's "injuries were deemed inconclusive [and, therefore,] the case was not supported for physical abuse." Nonetheless, the case "was supported for neglect due to a lack of supervision of [the brothers] by the birth mother." At the time, T.M. and her mother lived at T.M.'s grandmother's home. On August 25, 2006, T.M. was removed from her mother's care. The Child and Family Services Agency invited M.A.D. to a meeting concerning T.M.'s removal from her mother's care. At the meeting it was decided, with the mother's consent, that T.M. would be placed with the D.s.

At the hearing on the issue whether the mother's consent to T.M.'s adoption should be waived ("the show cause hearing"), the trial court took (without objection)[2] judicial notice of a November 21, 2006 order in which T.M. was adjudicated a neglected child pursuant to D.C.Code § 16–2301(9)(A)(ii)(x) (2006 Supp.) (defining "neglected child" as a child "who is regularly exposed to illegal drug-related activity in the home").[3] The natural mother consented to the neglect adjudication, stipulating that although she loved T.M. "very much," "due to her inexperience as a young mother and because she was frequently exhausted from working late hours, she was unable to adequately supervise [T.M.] in the home and to ensure that [T.M.] had proper nutritious meals." T.M.'s mother also acknowledged that in August 2006, she moved out of her own mother's home, leaving T.M. behind, and conceded that thereafter "she did not consistently participate in caring" for T.M. Notwithstanding the adjudication of neglect, at that point, the goal for T.M. was reunification with her natural mother. In the neglect adjudication, the natural mother "agree[d] to cooperate with [CFSA] and to accept, pursue and complete all reasonable service referrals provided to her by [CFSA]."

The trial court also took, without objection, judicial notice of a November 29, 2006 order committing T.M. to the care of CFSA for a period not to exceed two years. In the November 29, 2006 order, the trial court noted that it had determined that T.M. could not "safely remain in [the birth mother's] home" because medical and legal exams revealed that T.M. and her brothers had "numerous

---

1. This report was filed after the hearing on the issue whether the mother's consent to T.M.'s adoption should be waived, but before the trial court entered its written orders waiving the birth mother's consent to T.M.'s adoption and issuing the final decree of adoption.

2. Especially because the mother did not object to the trial court's taking judicial notice of several court documents from the neglect

case, we may consider the facts contained in those documents. See S.S. v. D.M., 597 A.2d 870, 880–83 (D.C.1991).

3. The neglect stipulation also applied to the mother's other two children—T.M.'s brothers—but because only T.M.'s case is before us in this appeal, we will not discuss T.M.'s brothers except where necessary.

unexplained non-accidental injuries." In that order, the trial court directed the mother to undergo weekly drug tests, family therapy, and anger management classes, and ordered CFSA to make available to the mother vocational assistance, housing assistance, parenting classes, and parental mentoring. According to Andrea Blatchford, a CFSA social worker handling T.M.'s case, T.M.'s mother did not "participate[ ] in the services that the Court ordered," though Blatchford did agree that the mother "very sporadically" participated in individual therapy before stopping.

At the show cause hearing, the trial court also took, without objection, judicial notice of a September 25, 2007 order that changed the permanency goal for T.M. from reunification with her mother to adoption with the D.s. That order noted that CFSA had made reasonable efforts toward reunification, but that it would be contrary to T.M.'s welfare to be with her birth parents because neither the mother nor S.G., T.M.'s father, was able to meet T.M.'s needs and had demonstrated that they could "safely parent" T.M. By the time of this hearing, T.M.'s mother had missed numerous drug tests; at the drug tests she did attend she tested positive for marijuana, but negative for hard drugs.

On December 26, 2007, the trial court issued a notice to T.M.'s mother to appear and to show cause why her consent to the adoption should not be waived. The show cause hearing was held on June 30, 2008; the mother failed to attend the hearing even though it is undisputed that she was served with and had notice of the hearing. At the conclusion of the hearing, the trial court made oral findings, concluding that it had "been demonstrated by clear and convincing evidence that [the mother was] withholding her consent to the adoption of [T.M.] by the D.s against the best interests of [T.M.]." On July 22, 2008, the trial court

entered a written order waiving the mother's consent to T.M.'s adoption and entered a final decree of adoption granting the D.s' petition for adoption. The mother appeals.

## II.

■ The legal standards governing this case are well settled. " 'A petition for adoption may not be granted by the court unless there is filed with the petition a written statement of consent,' D.C.Code § 16–304(a) (2001), given by the prospective adoptee's parent. D.C.Code § 16–304(b)(2)(B). The parent's consent may be waived by the court, however, upon a finding that the consent is being 'withheld contrary to the best interest of the child.' D.C.Code § 16–304(e). This determination is to be made based on clear and convincing evidence. Because the granting of an adoption over the objection of the natural parent necessarily curtails that person's parental rights, the court must weigh the factors considered in proceedings to terminate parental rights under D.C.Code § 16–2353[ ] before the adoption petition will be granted." *In re J.L.*, 884 A.2d 1072, 1076–77 (D.C.2005) (footnotes and one citation omitted). As relevant here, those "TPR" factors are:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or

caretakers, including the foster parent; . . .

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and

(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided.... Evidence of continued drug-activity shall be given great weight.

D.C.Code § 16–2353(b) (2001).

■■■■ "It is important to note that the court's inquiry is not to determine whether the adoption petitioners would be better parents, or would provide a better home for the children. Even after children have been found to be neglected, the birth mother retains an important and essential liberty interest in raising her children, and the termination of parental rights is a drastic remedy and may be ordered only upon a showing of clear necessity. Thus, this interest may be overridden only if there is clear and convincing evidence presented that continuing the parent-child relationship would be contrary to the best interests of the children, and not merely that the adoption would be more beneficial to their interests. As this court has noted, transferring custody of children from the natural parent to another: 'was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.' Parental rights, therefore, may not be terminated solely because of poverty, ill-health, or lack of education or sophistication, but only upon a high showing that such a drastic measure is necessary in order to protect the best interests of the child. We review

the trial court's ultimate determination for abuse of discretion." *In re J.L.*, 884 A.2d at 1077 (most quotation marks and citations omitted).

### III.

■■ In reaching its conclusion that T.M.'s mother was withholding her consent to T.M.'s adoption contrary to T.M.'s best interests, the trial court applied the five TPR factors listed in D.C.Code § 16–2353(b). After a close review of the record, we hold that the trial court did not abuse its discretion in waiving the mother's consent to T.M.'s adoption.

1. "[T]he child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages." D.C.Code § 16–2353(b)(1).

By the time of the hearing, the soon-to-be four-year-old T.M. had lived approximately one half of her life with the D.s, and had known the D.s even longer. T.M., according to M.A.D., called M.A.D. "mom" or "mommy," and referred to W.D. as "granddaddy." According to Andrea Blatchford, the CFSA social worker assigned to T.M.'s case, T.M. "adjusted very well" to living with M.A.D. and W.D., so that the D.s' home was T.M.'s home. As Blatchford summarized: "She is very well cared for from my observation and appears to be secure there. She is also making progress developmentally in their care and has over the period that I've had the case. They [*i.e.*, the D.s] are attendant to her needs. They [e]nsure that all of her services are up-to-date anywhere from dentist appointments to IEP meetings that they attend." Ultimately, Blatchford concluded that the D.s' home was a "stable and nurturing environment" for T.M. By contrast, Blatchford testified, "it would be

very disruptive for [T.M.] to leave [the D.s'] home or have to go anywhere else." As Blatchford explained, T.M.'s natural mother had not been "as consistent a presence in [T.M.'s] life" and the mother failed to "avail[ ] herself of" services that CFSA had provided her to assist her with her parenting skills and to deal with her addiction. Moreover, based on her "most recent knowledge," Blatchford believed that the mother did not have stable housing; indeed, Blatchford testified that the mother did not have stable housing "over the period" that she knew the mother. In light of this testimony, we conclude that the evidence supports the trial court's determination that "factor number one definitely favors the waiver of consent." *See In re J.L.*, 884 A.2d at 1078 (affirming trial court's conclusion that first factor weighed in favor of waiving mother's consent to adoption where petitioners "provided the children with a stable and permanent family home for nearly four years," but mother was unable "to provide for the children's physical, mental, and emotional needs")

(quotation marks omitted); *see also In re D.H.*, 917 A.2d 112, 118–19 (D.C.2007); *In re F.W.*, 870 A.2d 82, 86 (D.C.2005).

2. "[T]he physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child." D.C.Code § 16–2353(b)(2).

The trial court found that the second TPR factor "weighs in favor of waiving ... the birth mother's consent," and we cannot disagree. As the trial court found, although the D.s "are of an age older than normally thought of for a parent of a child [T.M.'s] age, both [D.s] are in good health and are taking care to maintain their good health." [4] In addition, the D.s formed a strong bond with T.M., took the child to all of her medical appointments, and provided for her educational needs. The trial court found that the mother, in contrast, failed to "participate consistently in recommended services, including therapy," [5] and

4. The trial court was correct to consider the D.s' advanced age in its analysis of T.M.'s best interests. *See In re A.C.G.*, 894 A.2d 436, 443 (D.C.2006). As noted above, however, the D.s were in good health at the time of the hearing. Moreover, M.A.D. testified that in the event that something happened that would impair the D.s from caring for T.M., T.M. would go back to her birth family on her father's side. On these facts, the trial court did not abuse its discretion in not treating the D.s' age as a "bar to adoption." *Id.* ("endors[ing]" trial court's decision that putative adoptive parent's age was not a "bar to adoption" even though it was "unlikely that [the adoptive parent] would live to see [the child] reach the age of majority" where that parent was in good health and had arranged for younger "backup caretakers ... who were known to [the child] and had agreed to rear her in the event that [the adoptive parent] died or became disabled.)" *But see id.* at 446–47 (Schwelb, J., dissenting) (arguing that adoption would not "effectively assure stability for the child" because "possibility" that adoptive parent would be able to parent child

until child reached majority was "quite speculative").

5. The mother is correct that no evidence was introduced at the show cause hearing to support the trial court's finding that the mother had a "long history of mental health and emotional needs." That said, a report and recommendation that CFSA submitted after the hearing (but before the trial court entered its written order) did reveal that the birth mother had a long history of mental illness, including nine psychiatric hospitalizations. Even if it were error for the trial court to consider this report because it had not been introduced at the hearing, the trial court's finding that the mother had a history of mental health needs would not justify reversal. In its conclusions of law, the trial court did not rely on the finding regarding the mother's health and emotional needs, and stated only that the mother failed to "participate consistently in recommended services, including therapy," which statement was supported by Blatchford's testimony. Stated differently,

did not assist with T.M.'s medical appointments or educational care. Thus, the evidence supports the trial court's determination that the second TPR factor weighed in favor of waiving the mother's consent to T.M.'s adoption. *See, e.g., In re J.L.,* 884 A.2d at 1078 (affirming trial court's conclusion that second factor weighed in favor of waiving mother's consent where trial court found that "birth mother was currently unable to address the children's physical, emotional and mental needs, while [petitioners] were attentive to these demands"); *In re D.H.,* 917 A.2d at 119 (similar).[6]

3. "[T]he quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent." D.C.Code § 16–2353(b)(3).

The trial court concluded that the third TPR factor weighed in favor of waiving the mother's consent to termination of her parental rights. The trial court reasoned that T.M. and the D.s had a "very loving and affectionate" relationship, that T.M. had a "good relationship with the [D.s'] extended family," and that the D.s "have consistently made efforts to maintain [T.M.'s] relationship with her birth family and have expressed a commitment to continue those relationships." These findings are well-supported in the record and are essentially undisputed. Although, as the mother emphasizes, there was evidence that she too had positive interactions with T.M., that is not enough to overturn the trial court's assessment of the third factor. *See, e.g., In re D.H.,* 917 A.2d at 119–20 (trial court did not abuse its discretion in holding that third factor weighed in favor of waiving birth parents' rights, even though it was undisputed that children loved their birth parents, and even where relationship between children and birth parents "improved"); *In re D.R.M.,* 570 A.2d 796, 808 (D.C.1990) (Schwelb, J., concurring) (this court correctly affirmed order waiving birth mother's consent to adoption even though "the mother [had] resumed contact with her daughter and ... had more than a dozen comparatively successful visits with her, during some of which the mother hugged and kissed her child and told her how pretty she looked").[7] In short, the extensive evidence

---

the trial court's error (if any) did not amount to an abuse of discretion because it did not prejudice the mother. *See In re L.L.,* 974 A.2d 859, 862–63 (D.C.2009) (abuse of discretion occurs only when exercise of discretion was in error, and impact of that error requires reversal) (citing *Johnson v. United States,* 398 A.2d 354, 367 (D.C.1979)).

6. Thus, although we agree with the mother that a mother's consent to adoption cannot be waived simply because the mother is not well off, cases such as *In re J.L.* recognize that it is proper for a trial court to consider, in determining whether the mother is withholding her consent to adoption contrary to the best interests of the child, what the birth mother has been able to provide for her child. As for the mother's contention that "there were substantial resources made available to the petitioners that were not made to the birth mother," we note first of all that, as the trial court found, the mother failed to avail herself of certain services that *were* made available to her. Moreover, although "agencies have an obligation to provide services and facilitate family reunification, this court has found no statutory requirement that such agency action is a 'condition precedent' to the commencement of a termination of parental rights proceeding since the 'overriding consideration is the best interests of the child.'" *In re P.S.,* 797 A.2d 1219, 1225 (D.C.2001) (quoting *In re A.C.,* 597 A.2d 920, 924–26 (D.C.1991)).

7. The mother contends that the trial court erred because it found that visitation was moved to T.M.'s grandmother's house in January 2008, as opposed to in April 2008; thus, the mother argues, she visited with T.M. twice in two, not six, months. This charge appears to be unsupported: although the trial court found that the "visitation schedule was changed in early 2008," the mother has not pointed to anything in the record to support

of T.M.'s bond with the D.s and T.M.'s limited interaction with her mother supports the trial court's determination that the third TPR factor weighed in favor of waiving the mother's consent to T.M.'s adoption. *See In re J.L.* 884 A.2d at 1078 (affirming trial court's conclusion that third TPR factor weighed in favor of waiving mother's consent to adoption where children had formed strong bonds with petitioners, whereas birth mother had history of being late for visits and missing visits entirely); *In re F.W.,* 870 A.2d at 86.

4. "[T]o the extent feasible, the child's opinion of his or her own best interests in the matter." D.C.Code § 16–2353(b)(4).

The trial court noted that T.M. was "very happy and comfortable in the [D.s'] home," but, in view of T.M.'s young age, declined to give weight to the fourth TPR factor. The trial court's analysis is supported by the evidence.

5. "[E]vidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided.... Evidence of continued drug-activity shall be given great weight." D.C.Code § 16–2353(b)(5).

As the trial court found, although T.M.'s mother failed to report for drug treatment consistently, her last positive drug test was long before the hearing. Declining to draw a negative inference from the mother's failure to report for drug testing, the trial court concluded that the evidence on the mother's drug use was "sort of at a draw," and therefore stated that it did not find that evidence "to be a terribly compelling or relevant factor" in the analysis. The evidence supports the trial court's determination.

## IV.

We have considered carefully the mother's arguments for why the trial court abused its discretion in waiving the mother's consent to T.M.'s adoption, but hold that reversal is not warranted.

■ The mother's primary argument is that the trial court was wrong to draw a negative inference from the mother's absence from the show cause hearing—the mother contends that her failure to appear "should have been given no weight whatsoever." We disagree. In *In re Antj.P.,* 812 A.2d 965, 971 (D.C.2002), we held that the trial court did not err in drawing an adverse inference regarding a birth father's relationship with his son where the father appeared at a hearing designed to determine whether his parental rights should be terminated, but failed to testify. Declining to disturb the trial court's decision, we observed that the father "had peculiar knowledge concerning the nature of his relationship with his son" and that the father's testimony "would have aided the trial court in assessing the D.C.Code § 16–2353 factors as they pertained to him." *Id.* The same consideration applies here: the mother had peculiar knowledge concerning her relationship with her daughter, her appearance would have helped the trial court to assess the TPR factors,[8] and

---

her claim that the trial court meant that "early 2008" was January 2008. At any rate, it is undisputed that the mother visited T.M. only twice after visitation was moved to T.M.'s grandmother's house in 2008. Therefore, the trial court's assessment of the third TPR factor was supported by the evidence.

8.  Significantly, in many of the cases where we have expressed disagreement with the trial court's determinations in this field, testimony from the birth parent has figured in our analysis. *E.g., In re S.M.,* 985 A.2d 413, 419 n. 10 (D.C. 2009) (vacating adoption decree where birth father testified, and it was clear that "unlike so many cases that come before us, the father had been involved in [his children's] lives since birth and shown a faithful commitment to visitation during the pendency

yet the trial court was not able to hear from her.[9]

In a related argument, the mother contends that the trial court wrongly shifted the burden of persuasion onto her when the trial court noted in several places that the mother failed to appear at the hearing. We disagree for largely the same reason that we disagree with the mother's adverse-inference argument. The trial court plainly recognized that the burden of persuasion rested with the D.s, and that they had to prove their case by clear and convincing evidence. In both its written and oral rulings, the trial court recognized that a court may waive a birth parent's consent to adoption, only if there is "clear and convincing evidence that the consent is being withheld against the best interests of the child." The trial court's observation that the mother did not prove contrary evidence did not shift the burden to the mother, but merely recognized that the evidence put on by the D.s was not rebutted. *See In re J.L.*, 884 A.2d at 1078 (affirming court's waiver of mother's consent to adoption and citing with approval trial court's finding that mother "had not shown that she can stay sober") (quotation marks and edit omitted).

Finally, the mother points out that M.A.D. testified that "everybody always knew that [M.A.D.] wanted [T.M.]," and claims that this testimony demonstrates that M.A.D. pursued the adoption out of selfish purposes, rather than T.M.'s best interests. We do not believe that the trial court erred in declining to take such a cynical view of M.A.D.'s testimony. Rather, M.A.D.'s desire to keep T.M., viewed in combination with testimony about the love and care M.A.D. had shown T.M., easily may be viewed as demonstrating that

of these proceedings"); *In re C.T.*, 724 A.2d 590 (D.C.1999) (vacating order terminating parental rights and noting birth parents' testimony about relationship with and wishes for children); *In re F.N.B.*, 706 A.2d 28 (D.C. 1998) (vacating order terminating parental rights where trial court gave insufficient consideration to birth mother's proposal for who should be awarded custody); *In re A.S.C.*, 671 A.2d 942, 944 (D.C.1996) ("termination of parental rights was premature" where birth parents testified at hearing to explain relationship with child).

9. We note, however, that the government is quite wrong to argue that Super. Ct. Adoption R. 39(a)(4) permits a "waiver of consent to adoption" to be "based *solely* on a birth parent's failure to appear at a hearing to show cause why consent should not be waived." (Emphasis added.) The rule simply does not say that. Rather, Rule 39(a)(4) states that a trial court may waive a birth parent's consent to adoption if the parent fails to appear at the show cause hearing. The parent's absence from the hearing, however, is not enough to justify waiving the parent's consent; hence the language stating that if the birth parent fails to appear, the trial court "*may* determine that the birth parent's consent is being withheld contrary to the bests interests of the child." Super. Ct. Adoption R. 39(a)(4). (Emphasis added.) This makes sense because otherwise a birth parent would be able to forever forestall termination of her rights by the simple expedient of boycotting show cause hearings. By contrast, it does not make sense to conclude, as the government surprisingly urges, that Rule 39(a)(4) overrides, or at the least curtails sharply, the protections that the D.C.Code and the Constitution provide against termination of parental rights. *See In re S.M.*, at 419 (holding that Rule 39(a)(4) does not shift the burden onto the parent where issue is whether parent's consent to adoption should be waived). Tellingly, the government does not cite a single case that reads Rule 39(a)(4) to mean that a birth parent's failure to appear at a show cause hearing necessarily means that clear and convincing evidence exists that a child's best interests would be served by separating the child from the parent. At any rate, the government's reliance on Rule 39(a)(4) is misplaced because that rule, by its plain terms, applies where the birth parent fails to appear at the show cause hearing "personally or through counsel," and in this case the mother's counsel did appear at the hearing.

M.A.D. had bonded with T.M. and sincerely believed that adoption was in T.M.'s best interests. Relatedly, because a court may issue a guardianship order only if, among other things, "the court finds that ... [a]doption, termination of parental rights, or return to [the] parent is not appropriate for the child." D.C.Code § 16–2383(c)(2) (2008 Supp.), we cannot say that M.A.D.'s decision to seek adoption rather than guardianship reflects poorly on M.A.D. *See also In re J.L.*, 884 A.2d at 1078 (rejecting birth mother's argument that she "should [have] be[en] allowed additional time to address her drug problem and eventually regain custody of the children" in view of "strong public policy, enhanced by federal legislation, disfavoring the protracted retention of children in foster care, and a 'wait and see' option indefinitely deferring adoption or termination of parental rights") (quotation marks omitted). Last, the mother asserts that the D.s' motives should be impugned because the D.s "gave up T.M.'s siblings immediately after a [CFSA] investigation commenced regarding physical abuse against one of the siblings by [W.D.]." We decline to draw that inference because the record is uncontroverted that the CFSA investigation revealed that the allegation of physical abuse against W.D. was "unfounded."

■■■ In closing, we appreciate that under our case law, "a child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit." *In re S.G.*, 581 A.2d 771, 785 (D.C.1990). Applying this principle, we recently vacated an adoption order in a case where the trial court failed to "accord[ ] the birth father the presumption and preference to which our case law entitles him." *In re S.M.*, 985 A.2d 413, 2009 WL 4681875, at *5. But the mother in this case, unlike the father in *In re S.M.*, 985 A.2d 413, 2009 WL 4681875, at *5, was adjudicated neglectful prior to the show cause hearing. Further, the presumption in favor of a birth parent applies only where the parent has grasped her "opportunity interest"—that is, "early on, and continually, [has] done all that [she] could reasonably have been expected to do under the circumstances to pursue [her] interest in the child." *Id.*, 985 A.2d 413, 2009 WL 4681875, at *4, n. 7. The birth father in *In re S.M.* thus benefitted from the presumption because he "had been involved with [his children] since birth," *id.*, having "faithfully and regularly visited" the children from the time the judicial proceedings in that case began until the adoption decree was issued. *Id.*, 985 A.2d 413, 2009 WL 4681875, at *1. In contrast, as stated above, the mother in this case did not have a comparable level of involvement with T.M. As a result, the presumption in favor of a fit parent who has grasped her "opportunity interest" is inapplicable in this case.

The trial court's order is

*Affirmed.*[10]

---

10. From our review of the record, it appears that potentially significant information that was available to the trial court did not make its way into the trial court's factual findings. We understand and respect the fact that trial courts have a unique vantage point with respect to family cases and have no doubt that the trial court in this case conscientiously weighed the facts before it. We note, nonetheless, that although we are satisfied that the trial court in this case did not abuse its discretion, appellate review would have been aided if the trial court, taking advantage of its superior perspective with respect to the facts,

had presented us with a more complete exposition of the evidence underlying its decision to waive the mother's consent to T.M's adoption.